# Frank Webb v. The State.

1. Insanity — Presumption of Law. — While one of the ingredients of murder is that the act is that of a person with a sound memory and discretion, it is, upon the other hand, equally well settled, both in law and reason, that every man is presumed to be of sane mind, until the contrary is shown.

2. Same — Evidence. — In order to absolve a defendant in a criminal case from guilt, a higher degree of insanity must be shown than would be sufficient to discharge him from the obligations of his contract.

8. Charge of the Court. — In all such cases it is the duty of the court to instruct the jury that every man is presumed to be sane, and possessed of sufficient reason to be responsible for his crimes, until the contrary is proved to their satisfaction; and that, to establish the defence of insanity, it must be clearly proved that, at the time of the offence, the accused was laboring under such a defect of reason as not to know the nature or quality of the act he was doing, or that, if he did know, he did not know he was doing wrong. The latter part of this question, when put in the abstract, as whether the accused knew the difference between right and wrong, is not so accurate as when put with reference to his knowledge of right and wrong in respect to the very act with which he is charged.

4. Same. — And since it is settled that men may be responsible for some things and not others, the inquiry into the sanity of the accused must be directed to the particular thing done, and not to any other, and has reference to the time of the transaction, and not to any other time.

5. Same — Evidence. — But with regard to the question of proof, in order to ascertain the state of the mind at a particular period, it is competent to inquire into its conditions both before and after in relation to a particular subject, and its condition as to other subjects.

6. Evidence. — Evidence of the state of mind of the accused, both before and after the act done, is admissible in determining the question of insanity.

7. Same — Presumption. — If derangement or imbecility be proved or admitted at any particular period, it is presumed to continue until disproved, unless the derangement was accidental, being caused by the violence of a disease. But this presumption is rather matter of fact than law, or, at most, partly of law and partly of fact.

8. Same — Non-professional Testimony. — Non-professional witnesses are competent to state their opinions as to the sanity of the party, derived from their acquaintance with and observation of his conduct, appearance, and actions. On this point the case of Gehrke v. The State, 13 Texas, 568, is overruled.

9. Same — Cumulative. — In view of this last ruling, as there are no definite limits within which evidence of this kind can be restricted, and because a

jury would be warranted in giving more credit to the opinion of the many than the few, such evidence cannot be regarded as cumulative.

10. Continuance — Case Stated. — An application for a continuance, based upon the absence of six witnesses, setting out their opinions of the sanity or insanity of the appellant, derived from their association with him, and their observation of his actions, language, and appearance, and complying with every requirement of the statute, was refused by the court below, and no reason is assigned therefor; leaving this court to infer that it deemed such evidence either immaterial or inadmissible. *Held*, error, as the evidence was highly proper, and the application in every way sufficient.

11. Jury and Officers of the Court. — See the opinion for an admonition to the officers of the court and the jury, touching their behavior pending the trial of a felony case.

Appeal from the District Court of Brazoria. Tried below before the Hon. W. H. Burkhart.

The indictment charged the murder of Charles R. Foster, in Galveston County, on September 2, 1876. The trial was had in Brazoria County, on a change of venue, and the appellant was convicted of murder in the second degree, his punishment being assessed at forty years' confinement in the penitentiary. The appellant interposed, to no purpose, the defence of insanity. He was defended in the court below by E. J. Wilson and J. T. Mitchell, Esqs.

Robert Vanderpool, the first witness for the prosecution, testified that he is now, and was on September 2, 1876, a resident of Galveston, Texas. Knew both appellant and deceased prior to the killing, and has known the appellant since. On the day last named, in Galveston County, Texas, he saw the appellant kill the deceased. On that day, between nine and ten o'clock, A. M., witness saw appellant sitting on the railroad track, near the stock-pens of deceased. He had his coat off, and thrown across his left arm. The office and stock-pen of deceased were not more than forty or fifty feet from where appellant was sitting. About this time witness saw deceased come out of the office and walk down to the gate. Appellant said to deceased,

"I want to see you." Deceased responded, "I'll see you when I get through with Paul." Appellant then said, "I've waited long enough; you've done me dirt," and fired at deceased three times. At the first shot deceased said, "Don't kill me, Frank." After the killing, appellant said, in reply to the book-keeper Norman's question what he had "done," "I gave him fourteen days to settle, and he didn't do it, and I killed him." Appellant appeared to witness to be all right. He fired on deceased three shots from a six-shooter pistol, which he pulled from under the coat he held on his arm, and after he fired he put the pistol back in the side-pocket of the coat, as it lay on his arm, and walked off. The pistol was a large-sized Colt's cartridge six-shooter. Witness saw appellant on the Thursday before the Saturday of the killing, at the Olive Branch Hotel, in Galveston City, and saw him in the city of Galveston some days before Thursday, and at no time noticed anything unusual or strange in his looks or conduct.

On cross-examination, the witness says that he was on the inside of the pen, through which he could see plainly, as it was an open, pine-plank fence. Jim Giddings was at the gate, holding it open. Appellant and deceased were outside. Giddings, Paul Bayse, and witness were about the same distance from the parties. Mr. Norman and Mr. Davis were in the office until the firing commenced, when they came out. Deceased came out of the office to sell some cattle to Mr. Bayse. Witness was in the employ of the butchers, driving cattle from the pen. After the killing, appellant very deliberately walked off in the direction of the city.

The State next introduced James Giddings, who testified that about one-half hour before the shooting, and while he was lying under a car on the side track south of the pen, appellant came down the track and sat down on it, holding his coat over his left arm. Presently Mr. Paul Bayse came

to the pens to buy some stock, and witness called deceased, who was then in the office, to come down. As deceased came, appellant said to him, " I want to see you ; " to which deceased replied, " I will see you as soon as I wait on Paul." Appellant then said, " I have waited long enough," and immediately pulled his pistol and commenced his fire. After the first fire, deceased staggered up against the fence, and said, " Frank, there is no use in that."

On cross-examination, the witness states that when the killing took place he was at the gate, and Vanderpool and Bayse near by.

The next witness introduced by the State was Paul Bayse, who, being a Frenchman, and unable to speak the English language, testified through a sworn interpreter. He testified that, on September 2, 1876, he was at the stock-pens of deceased, in Galveston County, when the killing occurred. Knew the parties ; and when the killing took place was about fifteen or twenty feet distant. Jim Giddings was about thirty feet off, and standing in the gate, Vanderpool about equidistant. When witness was coming to the pens he saw Giddings lying under a car on a side track, on the gulf side of the pen. Appellant was near by, sitting on the track, with his coat off. Witness counted only two shots fired by appellant.

Cross-examined : Witness says that he heard deceased say nothing. Heard appellant say something which he did not understand, as he speaks only enough English to buy cattle.

Joe Davis, witness for the State, testified that when deceased was killed, he and Norman, the book-keeper, were in the office together, and ran out on hearing the report of fire-arms. Witness stopped at the foot of the steps, but Norman ran on to where the body lay, meeting appellant walking from that direction. As the two passed, witness heard Norman ask, " Frank, what have you done ? " To

which appellant replied, "I told him I would give him a a chance." Appellant continued walking on towards town, and witness saw him an hour afterwards, under arrest. Had known appellant four or five years, and had been for five months boarding at the same house with him, and had never seen anything in his manner or conversation indicating insanity.

On cross-examination, witness testifies that he is neither an expert nor a physician. When appellant was brought back to the place of the killing, in the presence of the body during the whole time of the coroner's inquest, he displayed no emotion, but observed a seeming indifference.

A. P. Norman was the next introduced by the prosecution. He testifies that he was in the office of deceased when he was killed. Before the killing he saw appellant sitting on the railroad, as described by other witnesses. When he heard the shots he ran out, and saw appellant standing over the body of deceased, and as witness started towards them appellant walked off in the direction from which witness was coming. As witness ran by he asked, "Frank, what have you done?" to which witness heard no reply. On the Saturday week before the killing, witness met appellant in Galveston, and had a long talk with him about his business difficulty with deceased. Appellant gave witness correctly the dates of the transactions. Witness was the friend of both parties, and the book-keeper of deceased.

The misunderstanding spoken of grew out of some cattle business, the appellant having left some with deceased for sale. On the Tuesday before the killing, witness again met appellant in the Olive Branch Hotel, in Galveston, and there expressed the wish that the matter might be settled without a personal difficulty; to which the appellant assented, and requested witness to see deceased about it, and to that end.

On cross-examination, witness said that appellant told him that deceased had garnished his money, and that the

garnishment had to be withdrawn. Between this time and the killing, appellant did not call on witness to know if a settlement had been made. In his conversation, appellant was very bitter against the deceased, though he made no threats. In none of his communications with appellant had witness observed anything strange or unusual about his appearance. Appellant, for some time previous to the killing, though not at the time, had been in the employ of J. C. Borden, as salesman of stock, a position which required a shrewd business man. At the time of the killing, appellant was doing business on his own account, driving stock to the Galveston and Houston markets. Witness reported to deceased the conversation with appellant in regard to a settlement.

William Lott, for the State, testified that he was, at the time of the killing, a clerk in the ammunition store of Labadie. On the morning of the shooting, between seven and eight o'clock, appellant brought a Colt's cartridge six-shooter, of forty-five calibre, into the store, and had witness to load it all round, for which he paid the price, twenty-five cents. Appellant then put the pistol in the breast-pocket of his coat, and, throwing his coat over his arm, walked off. It is about one and a-half miles from Labadie's store to the stock-pen where the shooting was done. Witness noticed nothing unusual in the manner of appellant. Here the State rested.

The defendant introduced Amos Haynes, his cousin, who testified that he had known appellant from his childhood. The grandfather and granduncle of appellant had both been insane, and both committed suicide. The mother and a cousin of appellant were insane, and the father of appellant was a very strange and a very eccentric man. Witness never heard of other insanity in the family, and knows this as family tradition.

J. D. Webb, for the appellant, testified that he is the

brother of appellant. The grandfather and granduncle on their father's side had both been insane, and both committed suicide. Their mother was now, and had been insane for fifteen years. Their father was a very strange and eccentric man. Before he died he had a suit of clothes made. He had the coat, or robe, made to reach his heels, bound with wide red tape, and his pants with wide red stripes, and desired to be buried in the suit, with his boots on, using a plain box for a coffin. Don't know that he was insane.

When the appellant came home, about a month before the killing, his demeanor, appearance, and conduct were so changed that it caused apprehension that his mind had gone wrong. His habits of life had previously been jovial and sociable, but he now had became reticent, and would go to the woods alone, and remain so for hours. Would talk to no one, nor speak of his business matters. On this trip he remained at home but a short time before he went back to Houston, where he had some cattle. The day before the killing, witness went to Galveston to sell some cattle, getting there at night. Found appellant in bed, asleep, and it was with difficulty that he could rouse him, and it was a minute before he could be got to recognize witness and a friend who was with him. He looked strange and wild, and very much altered since witness had seen him the last time spoken of above. Appellant went down into town with witness and friend that night, and separated from them about one o'clock. Did not tell witness there was any business difficulty between him and deceased. Witness knew of no difference between the two before the killing, and thought they were friends. Witness left early next morning, and was shipping cattle during the day at Johnson Foster's pens, where he heard of the killing.

Henry Evans, for the defence, testified that in 1862, when appellant was a boy about fourteen years of age, he (witness) travelled with appellant and his father from Jackson

County, some 150 miles, to the city of Austin. On the road the father told witness that appellant was subject to spells of strange ways, and that, as his mother could not manage him, he was afraid to leave him at home. When his father left camp he always asked witness to watch appellant. Witness observed no marked evidences of insanity in appellant during this trip; he was wild and frolicsome, like other boys. Col. Webb, the father of appellant, was then enrolling officer, and had five conscripts and guard in charge.

Frank Taylor, for the defence, testified that he was, on September 2, 1876, bar-keeper at the Fitzpatrick Hotel, where appellant always boarded when in Galveston. He had been boarding there a long time. He had been absent some little time before the killing, and came back three or four days before the killing, looking very much changed. His eyes were wild and bloodshot, and his face swollen, though he had not been drinking to excess. Was drinking then less than witness had ever known him to drink. He would sometimes sleep very profoundly, and the two nights before the killing, witness heard him walking all through the night; and when asked what was the matter, he would say nothing, and talked but very little. During the day he would go into the sitting-room, sit down, pull his mustache, and talk to himslf. His conduct was so strange that both witness and Fitzpatrick remarked it, and declared that something was the matter with him.

On the day before the killing, deceased rode up before the bar-room and asked witness if appellant was in; and witness called appellant, who went out. The two shook hands friendly, and had a long talk, and when deceased rode off they shook hands again, and witness heard deceased ask appellant to come to see him. Appellant then came in, and slapped witness on the shoulder and said, "Let us take a drink, I have settled my business with

Charles Foster," and seemed to be very happy over it. After awhile he came back and asked me to take another drink, and those two drinks were the only ones I saw him take after he had got back to the city.

After the second drink, appellant went back to the same place in the sitting-room where he had passed the two previous days in such a strange manner, and seemed to relapse into the same moody way, having nothing to say to any one. That night he slept but little, but walked; and next morning he asked witness for his coat, which was behind the counter. He then went out, and returned sometime later and asked for his pistol, which witness had taken out of the coat pocket and put under the counter. Witness told him he would be arrested for carrying concealed weapons, and asked him what he was going to do with it. He responded that he was a policeman, and was going on duty, and that he had lost his badge. He was looking very wild and strange, and not drinking at all. He went out in a great hurry, and witness saw no more of him until he came back in the custody of James Cahill, and took a drink; when Cahill told witness what had happened, appellant appeared careless and indifferent, and looked just as he did before he left. Witness has never testified before, though he has been here three times. This is the first time this case was ever called for trial during the attendance of witness. Was not here at the mistrial. Was attached three days ago by the sheriff, and brought here. Does not recollect the date of the killing. It was in September, 1876. Does not recollect that the appellant was in Galveston in August, 1876. Doesn't know the date of the killing, — it may have been on the 26th. Witness's employment with Fitzpatrick ceased on September 1st, but witness did not go out of the house. Went back into his employment on the 2d.

A hypothetical case was then put to Dr. O. H. Seeds,

from the standpoint of the defence, and the doctor testified
that it indicated the acts of an insane man.

Upon cross-examination, the State stated a hypothetical
case from its standpoint, and the doctor testified that upon
such a view they were the acts of a sane man.

Dr. Turner's testimony was substantially the same.

Dr. Cochran, upon a hypothetical case stated by the
prosecution, stated that the acts would be those of a sane
man, and as presented by the defence, said they indicated
insanity; but he could not understand appellant's walking
a mile or so, although it might be explained or called
" method in madness."

No brief for the appellant has reached the reporters.

*Thomas Ball*, Assistant Attorney-General, for the State.
In this cause two questions present themselves.

1. Was it error to overrule appellant's motion for a con-
tinuance? It is thought not. The grounds set out in the
application for the various witnesses' evidence were to prove
appellant's curious, weird, wild, and vacant looks, in order
to show insanity, etc. In order to get a continuance on
this ground, the court must be satisfied of " *the materiality
of the evidence.*" The court below, in the exercise of
judicial discretion, held the contemplated evidence worth-
less, and refused the continuance. The statement of facts
shows, beyond question, that there were many witnesses
before the court on the final trial of appellant, put there by
him to testify as to his mental condition on and about the
time of the murder. So it will appear that no wrong was
done him for the want of other witnesses on the question of
pretended insanity, and he should not be heard to complain.
See Pasc. Dig., art. 2987, subdiv. 3 ; *McCarty* v. *The State*,
4 Texas Ct. App. 462.

2. In the motion for new trial, the main question raised

is that the jury acted improperly during the trial (not after the cause was submitted to the jury). During the trial the jury did not act so as to make an exception to the ordinary rule, and bring their action in this trial within the exception laid down in *Early* v. *The State*, 1 Texas Ct. App. 274, but will be controlled by the general rule as given in *Davis* v. *The State*, 3 Texas Ct. App. 93; *The State* v. *Forney*, 24 La. An. 191; *The People* v. *Montgomery*, 13 Abb. Pr. (N. S.) 207; *The State* v. *Morphy*, 33 Iowa, 270; *Ellis* v. *Ponton*, 32 Texas, 435.

As to the wild, weird looks of appellant, indicating insanity, as set out in the last motion, it is submitted that if every word relating to the insane condition of defendant, as stated in the motions for continuance and new trial, were true and had been proven on the trial, there would have been no difference in the verdict, because none of the statements indicate insanity, but only extraordinary actions, as forerunners of his contemplated deed. *Halbert* v. *The State*, 31 Texas, 357.

The transcript herein presents the only case of record (if appellant was in fact insane) where an insane person admits it. All the records of all the asylums in the world fail to show where an insane inmate has admitted his insanity. The reverse, though, is true with lunatics, — all are crazy except the lunatic. And it is submitted to the court that this peculiarity is a matter of history as to lunatics, and that the bare fact of a person asserting and swearing to his own insanity is sufficient ground for any court to overrule such sworn statement for a continuance, because such assertion at once judicially informs the court that the affiant is sane. But in this cause appellant had a fair hearing on insanity. All was submitted to the jury by the charge of the court, after much evidence was heard as to the pretended mental aberration; so, it seems, no wrong could have resulted from being forced into the trial.

'It is presumed that the motion to quash was waived and not acted on, as the record is silent. There does not appear any error in the charge of the court.

WHITE, J. It is a wise as well as most humane provision of our law that " no act done in a state of insanity can be punished as an offence." Pasc. Dig., art. 1643. With regard to murder, it is specially declared a part of the definition of the crime that it is the act of " a person with a sound memory and discretion."

On the other hand, it is equally as well settled, both in law and in reason, that every man is presumed to be of sane mind until the contrary is shown. 1 Greenl. on Ev., sec. 42. " In criminal cases, in order to absolve the party from guilt, a higher degree of insanity must be shown than would be sufficient to discharge him from the obligations of his contracts." Id., sec. 372. " In all such cases the jury are to be told that every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes, until the contrary is proved to their satisfaction; and that, to establish a defence on the ground of insanity, it must be clearly proved that, at the time of committing the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature or quality of the act he was doing, or, if he did know it, that he did not know he was doing wrong. The mode of putting the latter part of the question to the jury on these occasions has generally been, whether the accused, at the time of doing the act, knew the difference between right and wrong; which mode, though rarely, if ever, leading to any mistake with the jury, is not deemed so accurate when put generally and in the abstract as when put with reference to the party's knowledge of right and wrong in respect to the very act with which he is charged." 2 Greenl.

on Ev., sec. 373; *Carter* v. *The State*, 12 Texas, 500; 1 Whart. Cr. Law, 6th ed., secs. 15, 16.

Mr. Bishop says: "The inquiry is directed to the particular thing done, and not to any other; because, as we have seen, a man may be responsible for some things while not for others. Of course, also, it has reference to the time of the transaction, not to any other time. The reader, however, should distinguish these questions from questions concerning the proof; for, to ascertain the state of the mind at a particular period, we may inquire into its condition both before and after in relation to a particular subject, its condition as to other subjects." 1 Bishop's Cr. Law, 4th ed., sec. 476.

Evidence of the state of the mind of the party both before and after the act done is admissible in determining the question of sanity. 2 Greenl. on Ev., sec. 371.

Another rule, equally well settled, seems to be that "if derangement or imbecility be proved or admitted at any particular period, it is presumed to continue until disproved, unless the derangement was accidental, being caused by the violence of a disease. But this presumption is rather matter of fact than law, or, at most, partly of law and partly of fact." 1 Greenl. on Ev., sec. 42.

Whatever may have been the rules of evidence heretofore with regard to the character of proof admissible on the subject of insanity, the doctrine that non-professional witnesses should be allowed to state their opinion as to the sanity of the party, derived from their acquaintance with and observation of his conduct, appearance, and actions, has become too well settled to admit of doubt or controversy at this time. *Holcomb* v. *The State*, 41 Texas, 125; *McClackey* v. *The State*, decided by this court at the Tyler term, 1878, *ante*, p. 320.

We are aware that in *Gehrke* v. *The State*, our Supreme

Court, following in the wake of the decisions in Massachusetts and New Hampshire, held otherwise.   13 Texas, 568. The subject has, however, of late years been more thoroughly examined and discussed; and in New Hampshire particularly, in the recent case of *Hardy* v. *Merrill*, Foster, C. J., of the Circuit Court, in a most elaborate opinion, concurred in by the Supreme Court, reviews the previous decisions and overrules them, which places that court in full accord with the English and American doctrine as it now generally obtains on that subject.   56 N. H. 227.   The case of *Gehrke* v. *The State*, 13 Texas, 568, has been practically, as we have seen, and will be hereafter considered as overruled on this point.

Now, from what has been stated above, it necessarily follows that there are no definite limits within which the evidence can be restricted on an inquiry of this sort.   Nor is the investigation one in which the judge could well say that additional evidence would be but cumulative of like testimony already adduced; for the greater the number of witnesses who would depose to the opinion that a party was insane, the more likely would the jury, we apprehend, be inclined so to believe and become satisfied of the fact.

In the case at bar, the defence was insanity.   An application for continuance was made on account of the absence of six of defendant's witnesses, all of whom had been duly attached, and were under bond to appear and testify.   The facts to which they would depose are fully set out in the application, and it contained the opinions of those witnesses as to the insanity of the defendant, gathered from their associations with him, and their observations of his conduct, language, and appearance for some weeks prior and down to and including the very day of the killing, both before and after the act.

This application was, moreover, in strict compliance with

the requirements of the statute.   No reason is given by the court for its action in overruling it, and we are left to infer that it was upon the ground that the evidence was deemed immaterial or inadmissible.   We do not think so ; on the contrary, it appears to us both material, admissible, and pertinent to the issue to be decided ; and its materiality becomes much more apparent when we consider it in connection with the evidence actually adduced for the defendant on the trial.   How far these witnesses can be relied upon for the truth, or how far their testimony might have influenced the action of the jury in finding their verdict, it is impossible for us to say.   As presented to us, the application for continuance was sufficient, and should have been granted.

In reversing the case, we deem it necessary to refer to certain acts of misconduct (complained of) on the part of the jury and the officers having them in charge, which, to say the least of it, does not comport with our ideas of the serious solemnity of the duty of those having in charge the life of a fellow-being.   The jury were allowed to have and drink several bottles of whiskey, some of which were conveyed to them by the officer having them in charge.   Had any one of them become intoxicated to such an extent as to render it probable his verdict was influenced thereby, it would have been the duty of the court below to have granted a new trial.   Pasc. Dig., art. 3137, subdiv. 7.

Again, one of the jurors was permitted to make, and did make, a horse-trade with another party, who was not upon the jury.   It is true, the officer says it was done in his hearing and presence, and no injury, perhaps, was done the defendant under the circumstances.   Still, such things are calculated to throw suspicion upon a verdict; and a verdict in a case involving the momentous issues of life and death should be above suspicion, and command entire confidence.
*Early* v. *The State*, 1 Texas Ct. App. 248.

Because the court below erred in overruling defendant's application for a continuance in the first instance, and afterwards erred in refusing a new trial, the judgment is reversed and the cause remanded.

*Reversed and remanded.*