# B. W. CARTER v. THE STATE.

In appeals in criminal cases, ordinarily, the transcript commences with the indictment and proceedings thereon; and where it is contended that there is no record in the Court below, of the return of the indictment into Court by the grand jury, the fact must be made to appear by the transcript. *Quere?* As to the effect, where it is made so to appear.

A prisoner is presumed to be sane, until the contrary is proved.

Intoxication is not insanity, and where it is voluntary can never afford an excuse nor even a paliation for crime; *mania potu*, or *delerium tremens* are species of insanity, and excuse unlawful acts, although the intoxication which caused them, may have been voluntary.

Involuntary intoxication may be a paliation, and under some circumstances, an excuse for unlawful acts.

The question in cases of the plea of insanity is, whether the defendant was capable of distinguishing right from wrong, which capacity is necessary for the existance of a criminal intent; in cases of partial insanity, the question is whether the defendant was capable of distinguishing right from wrong, in the particular connection in which the unlawful act was done.

Appeal from Panola. Indictment for murder of William Mills. The killing occurred in the town of Pulaski, near a grocery, on the 3rd of December, 1851. The prisoner had been drinking to excess for several days, and more or less for several weeks. On the day of the killing there were several persons in and about the grocery, drinking and playing cards. While the prisoner and one Dodson were playing cards, the latter said to the other, on some trivial occasion, that he, the prisoner, did not have a soul larger than a mustard seed. A bystander, who stated that he considered it in jest, remarked to the prisoner in the same spirit, that if it were he, he would not take that. Thereupon the prisoner struck at Dodson, and a fight ensued between them, during which Mills stood by and declared that no one should interfere until one hollowed, and which ended in Dodson knocking the prisoner down with a piece of chimney timber, by a blow on the head. After this, the prisoner was ranting and raving about the premises, with his gun, and by his appearance and manner caused some fear

that he would injure some of the party, and from the testimony it seemed that two or three of the party were each apprehensive of an attack by the prisoner. At this time Mills remarked to Dodson that if he would give him a good whipping he would go home and behave himself. Mills and his brother-in-law, Baker, loaded a gun, and Mills picked up a two pound weight and put it in his pocket. A short time before the killing, Mills took a bowie knife which was handy, and put it in his bosom. It did not appear whether the prisoner knew of these hostile actions on the part of Mills, or not. The prisoner started and went a short distance down the hill from the grocery and shot off one barrel of his gun. Deceased proposed to Dodson to go down to him; Dodson refused to go, remarking that he might shoot. Deceased went, and as he approached the prisoner asked him whom he shot at. The prisoner replied he knew whom he would shoot. Deceased replied he would not shoot a deer; told him he was his best friend, to put down his gun and come in, and Dodson would treat. Deceased kept advancing; prisoner told him not to come any further or he would shoot, and presently did shoot and inflicted the wound which caused death. The shot appeared to have been duck shot, and some of them were flattened against the two pound weight which the deceased still had in his pocket. Several of the witnesses who took up the deceased, testified that he had no weapons about his person. The prisoner was a quiet, peaceable man when sober, but troublesome and quarelsome when drunk. There was an effort to prove that the prisoner had been rendered insane by excessive drinking, and the blow on the head. There was in proof a vague remark of the prisoner, made soon after he was arrested, to prove an old grudge. The prisoner and the deceased had been near neighbors for a long time, and so far as everybody knew had always been friendly. The prisoner made no effort to escape. Verdict, guilty of murder in the second degree, and confinement in the Penetentiary for three years.

*M. D. Rogers* and *S. M. Hyde*, for appellant. The motion

to arrest the judgment in this case, on the ground that the indictment upon which the defendant in the Court below was convicted, was not presented and returned into the said Court by a legal grand jury, ought to have been sustained. (Rainey v. The People, 3 Gilman, 71; 2 Virg. Cas. 527; Brown v. The State, 7 Humph. 155.)

*L. D. Evans*, also, for appellant, argued the case orally at the bar.

*Attorney General*, for appellee. The fifth assigned error " that the indictment was not returned into Court by a legal grand jury" is stated in the motion in arrest in the record, and clearly was designed only to call in question the legality of the grand jury, and not to question the fact that the indictment was returned, or was shown by the record to have been returned into Court by the grand jury. If the latter had been its object, the appellant should have brought up the caption of the record.

WHEELER, J. The ground relied on for a reversal of the judgment in the brief furnished the Court by counsel for the appellant, is that it does not appear by the record that the indictment was returned into Court by the grand jury.

The record in this Court is a transcript of the indictment and the proceedings thereon had at the trial. It does not purport to contain, nor need it contain a transcript of the record of all the proceedings had in the District Court anterior to the trial. The absence in the record of the evidence of the bringing into Court of the indictment by the grand jury, therefore, does not disprove the existence of such record evidence in the Court below. If there was not such record the fact should have been made to appear by the transcript. Where all the proceedings in the case are not shown by the transcript, and the error complained of does not affirmatively appear, regu-

larity in the proceedings will be presumed. (English v. The State, 4 Tex. R. 125.) The objection, it is conceived, is not supported by the record. The trial was at the same Term at which the indictment was found, and in the statement of facts it is said the indictment was returned into Court by the grand jury. There can be little doubt therefore that the fact did appear by the record. If the entry had not been made at the proper time, the omission might have been supplied by an amendment of the record in this respect, at any time during the Term, before the grand jury were discharged. And if there was such omission, this fact may account for the failure properly to reserve the point for review.

It is unnecessary to determine how far the objection, if supported by the record, could avail the defendant, where the indictment appears to have been filed as a record of the Court at the proper time; especially after the defendant has pleaded to the indictment. We have not access to the authorities on this subject cited by counsel. But in the case of the State v. Clarkson, (3 Ala. R. 378,) it was decided by the Supreme Court of Alabama that, "An indictment, found among the " files of the Court, and recognized as an authentic paper, " proves itself, when the question of authenticity is raised on " an issue to a plea to the same indictment." The Court said: " The fact to be proved, or rather disproved, was the authen- " ticity of the indictment, as a record of the Court. There al- " ways is, and necessarily must be, a period in the progress " of every prosecution, when the indictment is in *fieri*, and " we are not aware that any entry made upon it, or upon the " minutes made by the Clerk is necessary to give it effect as " a record. Indeed, the very fact of pleading to it, admits " its genuineness as a record." (3 Ala. R. 383.) It, however, is unnecessary in the present case to determine that question.

The defence was that at the time of committing the homicide the accused was insane, occasioned by the excessive use of ardent spirits. The Court gave instructions to the jury

upon the law applicable to this defence, which were not, and are not now complained of. But it has been insisted in oral argument at the bar, that certain legal principles of which the accused should have had the benefit were omitted; and that upon a proper view of the whole law upon the subject, the jury would have been warranted by the evidence in acquitting, or at least in imposing a milder punishment. We have attentively considered the charge of the Court and the evidence; and are unable to concur with counsel in the view they have taken of the case.

It is unnecessary to review the charge of the Court, as there is no part of it applicable to this defence, which is complained of as erroneous. Nor is it necessary to review the evidence. It may, however, be observed that the principal if not the only evidence in the case to support the plea of insanity is to be found in the facts and immediate circumstances attending the killing. There is no other evidence in the case from which the conclusion may be drawn that the accused was bereft of reason, than that which is to be found in the fact of killing under the circumstances. That was such as to afford conclusive evidence of malice; but not of insanity. In a certain sense, though certainly not in a legal sense, every unnecessary or unlawful homicide may be said to be an insane act. But to derive the evidence which is to acquit on the plea of insanity, from that source alone, if not equally as irrational as the act may be supposed to be, would at least be of extremely dangerous consequence. For the more causeless, unnatural and indefensible the homicide, the more deserving of condign punishment, the more fruitful would it be in the evidence which would screen from punishment. It is manifest, therefore, that the absence of any known cause or apparent motive for the commission of a homicide, can never be considered evidence to support the plea of insanity. Every man is presumed to be sane until the contrary appears. Insanity is an exception to the general rule; and before any man can claim the benefit of the exception, he must prove that he is within it. It has been

laid down as the law upon great authority and consideration, " That before a plea of insanity should be allowed, undoubted " evidence should be adduced, that the accused was of diseased " mind, and that, at the time he committed the act, he was " not conscious of right and wrong. This opinion related to " every case in which a party was charged with an illegal act, " and the plea of insanity was set up. Every person was sup- " posed to know what law was, and therefore nothing could " justify a wrong act until it was clearly proved that the party " did not know right from wrong. If that was not satisfac- " torily proved, the accused was liable to punishment."— (Whart. Am. Cr. L. 13.)

It is also to be remarked that it appears from the evidence that the accused was perfectly conscious of what he was about to do; and he does not appear to have even fancied that he was acting upon provocation, or was constrained to act in necessary self-defence. He does not appear to have labored under any delusion; but to have had, or believed he had, and it would seem not wholly without reason,—cause of ill-will towards the deceased for being the friend of his enemy. There does not seem, therefore, to have been an entire absence of the usual notice which incites to wicked, malicious and re- vengeful acts.

But without attempting to trace the act to the secret motive which prompted it, or to find the real or any adequate cause for its commission, (which is unnecessary,) it is further to be observed upon the evidence, (and it is a very material fact where the plea of insanity is set up, alleged to have arisen from the cause to which it is ascribed in this case,) that the accused shortly before starting out with his gun upon an avowed er- rand of death, indulged in such potations as were calculated, in his excited state, to incite to those acts of desperation, which are not unfrequently the fruits of the madness and frenzy oc- casioned by a sudden fit of drunkenness; and for which, when voluntarily and intentional, the law makes no allowance, and admits no extenuation of crime.

The law as applicable to this defence, and to the facts noticed, is presented with clearness and distinctness by Mr. Justice Curtis, in delivering the charge of the Court to the jury in the case of The United States v. McGlue, (1 Curtis (U. S.) C. R. 1, Law Magazine, Vol. II., No. 4,) where the defence was the same as in the present case. The Judge is reported to have said, "It is not denied on the part of the government "that the prisoner had drank intemperately of ardent spirits "during some days before the occurrence. But it is insisted, "that he had continued to drink down to a short time before "the homicide ; and that when he struck the blow it was in "a fit of drunken madness. And this renders it nesessary to "instruct you on the state of facts which the prosecutor as- "serts existed.

"Although *delirium tremens* is the result of intemperance, "and therefore in some sense is voluntarily brought on, yet it "is distinguishable, and by the law is distinguished, from that "madness which sometimes accompanies drunkenness. If a "person suffering under *delirium tremens* is so far insane as "to render him irresponsible, the law does not punish him for "any crime he may commit. But if a person commits a crime "when intoxicated, under the immediate influence of liquor, "the law does punish him, however mad he may have been. "It is no excuse, but rather an aggravation of his offence, "that he first deprived himself of reason before he did the "act. There would be no security for life or property if men "could commit crimes with impunity, provided they would "first make themselves drunk enough to cease to be reasona- "ble beings. And, therefore, it is a very material inquiry in "this case whether this homicide was committed while the "prisoner was suffering under that marked disease of *delirium* "*tremens*, or in a fit of drunkenness. If the prisoner while "sane made himself intoxicated, and while intoxicated com- "mitted a murder by reason of insanity which was one of the "consequences of that intoxication, then he is responsible in "point of law and must be punished. This is as clearly the

"law of the land as the other rule which exempts from pun-
"ishment acts done under *delirium tremens*."

The Judge further observed that it was incumbent on the
prisoner to satisfy the jury that he was insane when he struck
the blow; for the law presumes every man sane until the con-
trary is proved: and that if the jury were convinced that the
prisoner was insane to such an extent as to render him irre-
sponsible, they would acquit him unless they were also con-
vinced that his insanity was produced by intoxication, and ac-
companied that state; in which case they would find him guilty.

In the course of the charge it was observed " that this de-
" fence of insanity is to be tested and governed by principles
" of law, and not by any loose general notions, which may be
" afloat in the community, or even the speculations of men of
" science." Of the kind and degree of insanity which exempts
from punishment, it was said, " clearly it is not every kind
" and degree of insanity which is sufficient. There are, un-
" doubtedly, persons of great general ability, filling import-
" ant stations in life, who upon some one subject are insane.
" And there are others whose minds are such, that the con-
" clusions of their reason and the result of their judgment,
" are very far from being right. And others whose passions
" are so strong, or whose conscience, reason and judgment
" are so weak or perverted that they may in some sense be de-
" nominated insane. But it is not the business of the law to
" inquire into these peculiarities, but solely whether the person
" accused was capable of having and did have a criminal intent.
" If he had, it punishes him; if not, it holds him dispunishable.
" And it supplies a test by which the jury is to ascertain
" whether the accused be so far insane as to be irresponsible.
" That test is the capacity to distinguish between right and
" wrong as to the particular act with which he is charged."

Tested by these principles, it is very evident that the appel-
lant has no cause to complain that the crime of which he was
convicted, as it is exhibited by the evidence, was not regarded
with more leniency by the Court and jury who passed upon

his case. Without dwelling to review the charge given, it may safely be affirmed that it was not imperfect by the omission of any principle of law, which the accused can, with reason, invoke in extenuation of his crime.

It is understood that the argument questioned the correctness of the charge, upon the distinctions in the degrees of homicide; maintaining that it is too broad and comprehensive in its definition of the crime of murder, including in the definition homicide which should be held to be manslaughter only. It is not proposed to state the argument; as, from memory, we might not be enabled to do it justice. But in relation to the charge of the Court as respects the constituents, degrees and definition of the crime of murder, it will suffice to say, that it is substantially the same as that passed upon by this Court in the case of Jordan v. The State; and is, it is conceived, correct. We know of no authority or adjudication to the contrary.

We see no reason to apprehend that a less merciful dispensation of punishment was meted out to the appellant than the law and facts of the case warranted. And are of opinion that the judgment be affirmed.

Judgment affirmed.