ANTONY CLARK *v.* THE STATE.

1. JURY LAW. — In the call of a special *venire*, the defendant objected that the names as called were not in the same order as they appeared in the list furnished him, and thereupon the court directed that they be called as they stood upon his list; to which he objected, because he was not willing to expose his list. The court ruled that unless he enabled the sheriff to call the names from his list, they should be called from the writ; and the defendant, under protest, giving the names in their order on his list, they were so called. *Held,* that this latter mode was the correct practice. Art. 640 of the Code of Criminal Procedure directs that the names be called "in the order in which they appear on the list furnished the defendant."

Statement of the case.

2. INSANITY. — See an instruction on insanity held substantially correct in a trial for murder.

3. FACT CASE. — See evidence which sustains a conviction for murder in the second degree.

APPEAL from the District Court of Fort Bend. Tried below before the Hon. W. H. BURKHART

The indictment charged the appellant with the murder of Gabe Leonard, on March 2, 1878, by shooting him with a gun. The jury found him guilty of murder in the second degree, and assessed his punishment at confinement in the penitentiary for seven years.

This is a "nest-hiding" case of pronounced character. There was no room for controversy over the *corpus delicti*, or the appellant's sole instrumentality in its commission. The defence was insanity, or if that was not available, such mitigating circumstances as constituted a case of manslaughter rather than murder,—the alleged provocation being an adulterous intercourse between the deceased and the wife of the appellant. All parties immediately concerned, and nearly all the witnesses, were negroes, and the testimony is graphic as well as unusually concise.

Dick Allen, the first witness for the State, testified that the appellant came to his house the Monday before the killing, and asked him for the loan of a pistol. Witness asked him what he wanted with it, and he replied that Gabe Leonard, the deceased, was after his wife. Witness asked him how he knew it, and he said he had seen him at his house late in the night sitting on his door-steps, and had heard him in his room, after his wife; and if he caught him again after his wife, he would kill him as sure as he was a living man. Witness said to him, "Brother Clark, that is wrong; if you are satisfied it is true, you ought to take your things and quit her." Appellant said, No; if he caught him after her, he would kill him. On the succeeding Thursday witness again saw the defendant, who told witness that

he was mightily troubled. Witness asked him what was the matter, and he said that Gabe Leonard was after his wife. Witness tried to persuade him that he was mistaken, and asked him why he believed it. He said the Lord had showed it to him three times in the spirit, and the third time he was bound to believe it, and took hold of the matter; and that if he ever caught Gabe Leonard at his house after his wife, he would kill him as sure as he was a living man. Witness told Gabe Leonard the next day all that had passed between witness and the defendant, and told him he had better not go to the defendant's. Leonard said it was not so, and that he had never acted improperly with the defendant's wife.

On Saturday evening, a little before sunset, the deceased came to witness's house. The deceased, Byron Wallace, and witness were sitting on a log near the house, talking about the Scriptures, and witness was reading to the others, when some one said, "Yonder comes Brother Clark now;" to which the witness paid no attention, thinking the defendant was coming to go to church. About that time witness's wife screamed, "Look out! Antony is going to shoot." Witness and his companions jumped up, and the deceased, catching hold of witness, tried to throw him between the defendant and himself. The defendant snapped his gun. In the scuffle between witness and the deceased they fell down. Defendant fired, and struck the deceased under the arm with the whole load from the gun. Witness and deceased jumped up, and the deceased ran off into the woods, pursued by the defendant, who was snapping his gun. In a little while the deceased, bloody, and leaning on Byron Wallace, came back and went to Wallace's house, and there died that night, just before day. The shot were turkey-shot; witness got one of them, which had struck a rail.

Byron Wallace, for the State, testified that on the Monday before the killing he met the defendant, who seemed to be vexed in spirit, and told witness he was in great trouble.

Witness asked him the cause, and he replied that a man was going between him and his wife. Witness asked who it was, and he said it was the deceased. Witness replied, " No ; that deceased belonged to the same church." Defendant said it was true ; that he had seen deceased in his house at night, and he would kill him if he ever caught him there after his wife.

This witness gave the same account as the previous witness of what occurred when the fatal shot was fired. He followed the deceased when the latter, pursued by the defendant, ran into the woods. The deceased said to witness, " Brother Wallace, you are going to let him kill me." Witness said, " No, not if I can help it ;" and then spoke to the defendant, who said, " Stand back !." Defendant was cursing the deceased, and saying, " You have been after my wife." The deceased denied it, and finally they stopped, and the deceased leaned against a tree. Defendant still accusing the deceased, and the latter denying the charge, the defendant finally told him that if he denied his word he would knock his brains out, and raised and brought the gun down on the deceased's head, but did not strike with it. Witness tried to pacify the defendant, but could not. Defendant was excited, and offered no assistance to the deceased, but at length went away. With witness's assistance, the deceased walked two or three hundred yards to witness's house, and died there that night. Witness and the defendant were both preachers of the church to which the deceased belonged. When the deceased came to Allen's, where he was shot, he came from the direction of the defendant's house, which is not on the main road for the deceased to travel in coming to Allen's, but a little out of his way. Witness could not say for what purpose the deceased came round by the defendant's.

A. Bond, for the State, testified that he was a justice of the peace, and held an inquest on the body of the deceased, under whose left arm he found a gunshot wound at which

the entire load seemed to have entered, ranging backwards towards the spine.    On the day of the inquest witness asked Caroline Clark, the defendant's wife, if the deceased had made improper approaches to her.    She replied, " They say so, but I never gave them any grounds to say so."    It does not appear that this statement of the defendant's wife was made under oath.    This constituted the evidence in chief for the State.

The defence first introduced Martha Clark, the defendant's mother.    She testified that he, about a week before the killing, said to her, " Mammy, Gabe Leonard is keeping my wife ;" to which she replied, " No, I guess not."    He said, " Yes, it is so ; I saw him in my room at night."    Defendant was very much attached to his family, a good husband and father, and had always been an industrious man ; but during the week before the homicide he came many times to talk with witness and her husband, and was so much troubled that he could not work.    He and the deceased were raising crops in different parts of the same field.    In the spring of the year, while the defendant was working in a remote part of the field, and out of sight of the deceased, witness, who was working in her garden, saw the defendant's wife go to where the deceased was working, and hold a conversation with him, and then they went off together.    Afterwards witness saw the deceased and the defendant's wife looking and smiling at each other in church ; and on one occasion in church, while the deceased was giving out a hymn, he was looking and smiling all the time at the defendant's wife, and was so much distracted that he could not give out the hymn correctly.

Caroline Clark, the defendant's wife, testified that the deceased, about two weeks before the killing, accompanied her home from the house of her husband's father, and on the way she " submitted to his overtures," which he had been pressing on her for a long time.    About ten days before the killing he came to witness's bed, and " after accom-

plishing his purpose," the fire blazed up and he went out, and the defendant, who was sleeping in a different bed, immediately roused up and told witness that somebody had been in the room and gone out. Witness told him she had been asleep, and he said he knew it was Gabe Leonard, the deceased. " I then," said the witness, " confessed the whole matter and begged pardon. From that time to the killing the defendant was very unhappy, and talked frequently about the occurrence, and urged me to confess my guilt. On the evening of the killing, the deceased came around by our house on horseback. I was out in the yard, taking up some clothes, and he made signs to me which were understood between us. My husband was sitting in the door of our house. I don't know whether he (the deceased) saw my husband or not, but he could be seen under the limbs of the trees by the defendant. When he passed, the defendant came out and demanded that I should explain. I was so overcome from my shame that I confessed the whole that had passed between deceased and myself, — defendant promising that if I would confess he would forgive. He then disappeared, and in a short time I heard the gun fire."

The witness stated that the deceased had many friends and relatives in the neighborhood, and the night the deceased died she heard that they were coming the next day to punish her for what had been done; and therefore she denied guilty intercourse with the deceased, or that she had given the defendant reason to believe it. In the conclusion of her testimony she said that the evening of the killing was the first occasion on which she confessed " her guilt " to the defendant; explaining that her previous confessions " of the whole matter " related only to the advances of the deceased to her.

Aleck Clark, the defendant's father, testified to the great distress and restlessness of the defendant for a week before the killing, and in substance concurred with the testimony

of Martha, his wife, on that subject and the statements made to them by defendant about the infidelity of his wife with the deceased. On the Saturday night of the killing, the defendant came and told witness what had occurred at and immediately before the shooting, and asked witness's advice as to what he should do. Witness replied that he had no advice to give him, and that he must pursue his own course.

J. C. Mitchell, for the defence, testified that on the morning after the killing, the defendant came to his house, and said he had come to give himself up to the sheriff, stating that he had shot and killed the deceased, and relating the circumstances. Witness told him where the sheriff lived, and he went off in that direction.

H. Ogilby, a deputy-sheriff, stated that he heard of the killing the morning after it was done, and on going to the sheriff's, there found the defendant in the kitchen, and arrested him.

Several of the best citizens of the county testified that they had known the defendant from his boyhood, and gave him an excellent character in all respects.

*W. L. Davidson*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J. The appellant was indicted for the murder of one Gabe Leonard, alleged to have been committed in the county of Fort Bend, on March 2, 1878. On the trial below he (the appellant) was convicted of murder in the second degree, and his punishment was assessed at confinement in the penitentiary for a term of seven years.

It is insisted on the part of the appellant that several errors were committed by the court in serving and calling the special *venire* summoned for the trial, the most material of which will clearly appear from an explanation made by the judge to one of the bills of exception, as follows: " The

names on the original *venire* and on the list (served on the defendant) were identically the same in number and names, but several were different in the order as they appeared on the original and the copy.   As the names so different in their order (there being several) were called from the original writ returned into court, the defendant objected on the ground that they did not appear in such order on the list furnished him, whereupon the court directed that the names be called in the order as upon the list furnished defendant ; to which defendant objected on the ground that he did not want to expose his list.   Thereupon the court stated that he could call the names himself, and he excepted.   Thereupon the court stated that unless he allowed the names to be called in the order as they appeared on his list, or called them himself (that is, informed the sheriff of the order), the names would be called from the original writ.   The defendant then gave the names in the order they appeared on his list, under protest, and so they were called, and so the jury was empanelled.   The defendant only exhausted five peremptory challenges in empanelling the jury.''   From this statement of the causes of disagreement between the court and the counsel, it seems that after the special *venire* had been summoned, the clerk, in preparing a list of their names for service on the defendant, placed the names so that they did not stand in the same order on the two lists of jurors, — the names, however, being the same in both lists.

As matter of practice under the Code of Procedure as it now exists, when a special *venire* shall have been ordered for a capital case, the names are to be drawn as designated in art. 610, and to be summoned as directed in art. 613. ''The officer executing the writ shall return the same promptly on or before the time it is made returnable.   The return shall state the names of those who have been summoned ; and if any of those whose names are upon the list have not been summoned, the return shall state the diligence

that has been used to summon them, and the cause of the failure to summon them." Art. 614. Art. 616 directs the clerk and sheriff as to their duties on receiving the list so summoned, as follows: "The clerk, immediately upon receiving the list of names of persons summoned under a a special *venire*, shall make a certified copy thereof, and issue a writ commanding the sheriff to deliver such certified copy to the defendant, and such sheriff shall immediately deliver such copy to the defendant and return the writ, indorsing thereon the manner and time of its execution." From a reading of these articles of the Code, it is manifest. that the law contemplates that there shall be no material difference in the two lists, — that summoned by the sheriff, and the certified copy thereof prepared for service on the defendant.

Art. 618 and following articles direct the course of procedure in forming the jury for the trial of a capital case, and, among other things, direct that the names of those summoned as jurors in the case shall be called at the courthouse door, and such as are present shall be seated in the jury-box; and unless some one or more of the causes of challenge or excuse provided be interposed, it is from the names of those summoned as jurors in the case, and who are present on call and are seated in the jury-box, that a jury is to be formed, if a sufficient number be found for the trial of the case. The order of calling the names of the jurors is prescribed in art. 640, in this language: "In selecting the jury from the persons summoned, the names of such persons shall be called in the order in which they appear upon the list furnished the defendant." It is manifestly the intention that it is from the list furnished the defendant that the call is to be made, and in the order the names stand upon that list. So that, in the controversy between the court and the counsel, the result was that the names of the jurors were called from the proper list, and in the order there found, as appears from the record; and

there was no material error to the prejudice of the defend-
ant in providing or in the manner of selecting the jury.

A question is raised as to the sufficiency of the charge of
the court on an issue of insanity, set up for the defendant
on the trial. The charge of the court was excepted to, and
special charges were asked which the court declined to give
on the ground that the law was properly given in the gen-
eral charge. The following is found in the general charge
of the court: "Among other defences made in this case
is insanity created by jealousy and other conditions of the
mind growing out of the infidelity, or suspected infidelity,
as the case may be, of the wife. In this connection you
are charged that only a person with a sound memory and dis-
cretion can be held punishable for a homicide, and that no
act done in a state of insanity can be punished as an offence.
Every man is presumed to be sane until the contrary
appears to the satisfaction of the jury trying him. He is
presumed to entertain, until this appears, a sufficient degree
of reason to be responsible for his acts ; and to establish a
defence on the ground of insanity, it must be clearly proved
that at the time of committing the act the party accused was
laboring under such defect of reason, from disease of the
mind, as not to know the nature or quality of the act he was
doing, or, if he did know that, he did not know he was
doing wrong, — that is, that he did not know the difference
between the right and wrong as to the particular act charged
against him. The insanity must have existed at the very
commission of the offence, and the mind must have been
so dethroned of reason as to deprive the person accused of
a knowledge of the right and wrong as to the particular act
done. You are to determine from the evidence in this case
the matter of insanity, it being a question of fact, controlled,
so far as the law is concerned, by the instructions herein
given you."

On a comparison of this charge with standard elementary
writers on the subject of insanity as a defence for crime,

and with adjudications of the courts of this State, we are of opinion that the charge, with reference to insanity generally, as well as the particular insanity or emotional derangement of the mind set up in the case, was a substantially correct enunciation of the law of the case, and as favorable for the defendant as the testimony warranted. Whart. Cr. Law, sects. 15–24; 1 Archb. Cr. Pr. & Pl. 4–4, 4–5, and note 1; *Carter* v. *The State*, 12 Texas, 500; Penal Code, arts. 39, 40; *Webb* v. *The State*, 5 Texas Ct. App. 596, and authorities there cited; *Williams* v. *The State*, 7 Texas Ct. App. 163.

It is urged in argument that if the facts proved established any offence at all, it was manslaughter and not murder. This matter was fairly submitted to the jury under a seemingly appropriate instruction from the court. We cannot say that the homicide was proved to have been committed at the first meeting or the first opportunity after the conduct of the deceased and the wife of the defendant became known to him, or that the testimony does not warrant the verdict and judgment. Finding no error in the judgment, it is affirmed.

*Affirmed.*