## Henry Loggins *v.* The State.

1. Minutes of Court. — Irregularities in the record-entry of the presentment of an indictment do not constitute cause for setting aside the indictment, or in arrest of judgment. Such matters should be mooted by suggestion *in limine* to the court wherein the indictment was presented, and are not available in a different forum, to which the venue has been changed.

2. Evidence — Practice. — The acts or declarations of one conspirator, done or made during the pendency of the conspiracy and in furtherance of the common design, are evidence against the others. But proof must be adduced before the jury of the defendant's complicity at the time such acts were done or declarations made by his alleged confederate. The sufficiency of this proof as a predicate for the imputed acts or declarations is primarily determinable by the presiding judge; but if its sufficiency is an issue in the case, it should be submitted to the jury, with instructions to disregard the putative acts or declarations in case they deem the defendant's complicity not established. See the opinion *in extenso* on this subject.

3. Same — Tacit Admissions. — Though, on the principle of acquiescence, declarations made by third persons in the presence of the accused, respecting the matter in question, are ordinarily evidence against him, yet this principle does not apply to declarations which called for no response or disclaimer by him. See the illustration in the present case.

Appeal from the District Court of Austin. Tried below before the Hon. L. W. Moore.

On July 9, 1879, Reuben Morris, driving in a buggy on a public road in the county of Waller, was fired upon and killed. The grand jury of Waller County, at the October term, 1879, of the District Court, presented an indictment for the murder against Reuben Loggins, Williford Loggins, and Henry Loggins, the appellant. In his entry of the presentment of this indictment on the minutes of the court, the clerk omitted the names of the defendants, but inserted the number of the indictment, with the designation of the offence. The defendants were in jail when the indictment was presented. At the same term the venue was changed to the adjoining county of Austin, on motion of the defendants.

In January, 1880, the cause came to trial in the District Court of Austin County, and on the application of Reuben and Williford Loggins a severance was granted, and Henry Loggins, the appellant, put upon his trial. The jury found him guilty of murder in the first degree, and assessed his punishment at a life-term in the penitentiary.

The appellant is the son of Reuben and the cousin of Williford Loggins, and Reuben Morris, the deceased, was a cousin of the appellant. It appears incidentally that Dan Morris, a brother of Reuben Morris, had shot and killed Tom Loggins, a brother of the appellant, a short time before Reuben Morris was killed; and this, according to the theory of the State, instigated the assassination of Reuben Morris.

Reuben Loggins, it appears, lives between three and four miles from the town of Hempstead, and his house is a half-mile or more from the Hempstead and Rock Island road. Reuben Morris, the deceased, lived in the same direction from Hempstead, but at a greater distance. In the forenoon of the day of his death, he went from his home to Hempstead in a buggy, and in the afternoon about four o'clock, as he was returning and had reached a point on the road nearly opposite the house of Reuben Loggins, he was

fired upon and struck with fourteen buckshot, one of which entered his head and the remainder penetrated the right side of his back, indicating that he was fired upon from the right and rear.    Inside a field on the right of the road, and some fifty or sixty feet from where the body was found, were two "ambushes," constructed of bushes cut and laid horizontally to a height of about three feet.    Immediately around them the ground was much trampled, but no measurement of tracks could be obtained there.    A small branch, however, ran between them, and in the moist sand at its edge a distinct track of a number eleven brogan shoe, with a broad heel, was found.    A measurement of this track was found to fit the shoe of Reuben Loggins.    A smaller track was also found near by, but on applying a measurement of it to the shoes or boots of Williford Loggins and the appellant, it proved larger than either of them, and especially the appellant's, who submitted willingly to the test.    In a field a few hundred yards further up the road, Jim Taylor and Tillman Loggins, two negroes, had been hoeing cotton for Reuben Loggins during the day, and in a more distant part of the field one Mike Rothfus was ploughing.

Tillman Loggins was the most material witness for the State, and the only witness at the trial who professed to have seen any of the incidents of the homicide, though several heard the reports of the fatal guns.    He testified that as the deceased passed towards Hempstead in the forenoon, he called to witness, who was hoeing in the field, and said he wanted witness to drive a wagon for him, and arranged for witness to meet him in the road as he should pass on his return from Hempstead.    About dinner-time, according to this witness, the appellant and Williford Loggins brought their horses and staked them near a gin-house about three hundred yards from the ambushes, and then went on in the direction of the ambushes.    After awhile Reuben Loggins brought his horse to the branch and watered him, and then went back to the house, but afterwards came down

again and went in the direction the appellant and Williford had gone. After hoeing for some time, witness, seeing the deceased coming down the road from Hempstead, and himself desiring to go to Hempstead for some tobacco, concluded to take his pony, meet the deceased, and go on to Hempstead. He told Jim Taylor to tell Capt. (Reuben) Loggins, if he came out there, that he (witness) had gone to Hempstead. Witness, leaving Taylor in the field, proceeded and got into the main road, and on a hill, from which he saw the deceased coming down another hill, and presently heard one gun, and then two more, and saw the deceased fall from his buggy, at about seventy-five yards distant from where witness then was. Deceased's horse came past witness at full speed, and witness next saw Reuben and Williford Loggins and the appellant come up a path inside the field and from the direction of the ambushes. They had guns in their hands. Witness fell flat in a fence-corner as they passed by him on the other side of the fence, and after they left he went down to the deceased, who, though still gasping, was unable to speak. Three dogs which always followed Capt. Loggins were down there. Witness remained ten or fifteen minutes, and until after the deceased died, and then he went back into the field where Jim Taylor was. Another negro, named Charlie Williams, and a negro woman came along up the road, hallooing loudly. They stopped and told Mike Rothfus that Reuben Morris had been killed down the road. Jim Taylor went to Capt. Loggins's house to tell him, and on his return said that Capt. Loggins wanted them to go to the house, and to bring the horses along. After they reached the house, Capt. Loggins told witness to gather some figs. Witness handed the figs through a window to Capt. Loggins, and told him that Jim Taylor and he, witness, wanted to go down and see the body. "He said we had best not go; that I might be questioned about this thing. He told me to keep my mouth shut."

The witness was subjected to a crucial cross-examination.

He had previously been a witness at the inquest held on the body of the deceased, and at other judicial investigations of the case.     From his testimony on those occasions the defence read to him many statements not to be reconciled with his testimony in chief on this trial.     He admitted having made the most of the statements, but accounted for them by saying that he was afraid of the consequences to himself if he told what he knew, and that his life had been threatened, though not by any of the defendants, nor at their instance, so far as he knew.     In several circumstances detailed by him he was contradicted by Jim Taylor and Mike Rothfus, who were introduced by the defence.     On his re-examination, as it appears in the record, it was elicited that Reuben Loggins, the morning after the murder, said to him, "Reuben Morris caused my son Thomas's death, and I had said he should go dead; and now you see he is dead."     Williford Loggins and the appellant were present when this was said.

Daniel Loggins, an uncle of the appellant, was introduced by the State, and testified that, a week or two before Reuben Morris was killed, the appellant remarked that if he knew that Reuben Morris had not been the cause of Dan Morris coming back and killing his brother, Tom Loggins, from behind a tree, he would have nothing against him. And on the Monday next before the killing of Reuben Morris, witness and his brother, Reuben Loggins, had a conversation in Hempstead, in the course of which the latter said that he considered Reuben Morris to have been the cause of the murder of his son Tom by Dan Morris; that Tom had told him that he would be killed, and he told Tom that the man who killed him should die.     In the same conversation Reuben Loggins said that Reuben Morris ought to die, and must die.     Witness talked with him, and told him it was best to let the law take its course, and he finally seemed satisfied that witness was right.     "Reuben Loggins," said the witness, "seemed to be beside himself at the time."     It

appears that, when this conversation was had, an application of Dan Morris for bail was on trial. To the admission of this, as well as to all other statements of Reuben Loggins, the defence objected on grounds indicated in the opinion.

Other witnesses were introduced by the State, but none of them directly implicated the appellant. The buckshot extracted from the body of the deceased, and some paper used as wadding, and found near by, corresponded with shot found in two guns obtained in Reuben Loggins's house, and with a torn paper bag also found there.

The defence introduced testimony tending to prove that the appellant and Williford Loggins were on the gallery at the house when the deceased was killed. A principal effort of the defence was to discredit the testimony of Tillman Loggins, and in several circumstances they contradicted him by Mike Rothfus, Jim Taylor, and others. The defence put the appellant's character in issue, and by many old citizens, who had known him long and well, proved it unsurpassed as that of a peaceable, inoffensive, and law-abiding citizen.

*Shepard & Garrett, A. J. Harvey,* and *John P. Bell,* for the appellant, filed an admirable brief and argument.

*Thomas Ball,* Assistant Attorney-General, for the State.

CLARK, J.    That provision in our Code of Criminal Procedure which provides that the fact of a presentment of an indictment in open court by a grand jury shall be entered upon the minutes of the proceedings of the court, noting briefly the style of the criminal action and the file-number of the indictment, but omitting the name of the defendant, unless he is in custody or under bond (art. 415), can hardly be construed as imperative and absolutely indispensable to the validity of all subsequent proceedings.

It was evidently designed by the article in question to reg-

ulate a matter of practice and to prescribe a uniform mode. for recording presentments, and not to furnish a sole and exclusive test by which the authenticity of an indictment must be established.   It is a constitutional right to be tried for a felony, under our law, solely upon an indictment pre- ferred by a grand jury, and a party brought to trial is priv- ileged, at the proper time and by the proper method, to put in issue the authenticity of the paper claimed by the prosecution as such indictment.   Upon the trial of such an issue, the record of its presentment in open court as required by law would be a conclusive circumstance that an indictment against the identical party on trial, indorsed with a similar file-number, had been duly presented, but it would still remain for inquiry and determination whether or not the particular paper before the court was in fact the same document.   And this is the material question.   It cannot much concern the defendant whether the preliminary record is in exact accordance with the law, but he is vitally con- cerned in knowing whether or not a grand jury, as a result of their investigations under oath, have preferred and caused to be filed against him an accusation for crime in the form prescribed by law.

And in addressing itself to this investigation, the court is not required to look beyond the indictment and its file- mark.   Before the adoption of the Codes, it was held that an indictment found among the files of the court, and recog- nized as an authentic paper, proves itself, when the question of its authenticity is raised on an issue to a plea to the same indictment.   *Carter* v. *The State*, 12 Texas, 503 ; *The State* v. *Clarkson*, 3 Ala. 378.   And under the Codes the same rule necessarily obtains.   No mode of pleading is therein provided, by which a defect or irregularity in the record of presentment can be availed of by a defendant ; and if it is desired to put in issue the authenticity of an indict- ment, it can only be done by a motion, in the nature of a suggestion to the court, that there is no indictment on file

against him, which motion is determined by an inspection of the paper purporting to be an indictment.

The indictment at bar bears the file-marks of both the clerk of the District Court of Waller County and of Austin County, and the file-number of the case as stated in the record of presentment in the District Court of the former county; and we may well assume that this did not escape the attention of the learned judge who presided on the trial. A doubt as to its absolute genuineness and authenticity could hardly arise, but if any such should obtain, we are not sure that the certificate of the District Court of Waller County is not competent in law to dispel it. *English* v. *The State*, 4 Texas, 126. The irregularity in the minutes of the District Court of Waller County was immaterial; and not calculated in any manner to prejudice the rights of the defendant to a fair trial under the forms of law; and not having been objected to in the court where presented, an objection came too late after change of venue to another county.

Upon the trial of the cause, the State offered in evidence certain declarations made by Reuben Loggins, father of defendant, and jointly indicted with him for the homicide, but not on trial with defendant, a severance having been granted, to the effect that three days before the homicide Reuben Loggins had declared that the deceased was the cause of the death of Thomas Loggins, his son, at the hands of Dan Morris, brother of deceased, and that the deceased ought to die, and must die. Defendant objected to this testimony because it was hearsay and irrelevant and because he was not present, and could not be inculpated by the declarations of Reuben Loggins made in his absence, there being no evidence showing a conspiracy between them. The objection was overruled and the evidence admitted.

The principle authorizing the introduction in evidence of the declarations of a co-conspirator, though originally constituting an exception to the general rule excluding hearsay

evidence, has become fixed in the law of evidence, and is as prominent a feature of that law as the general rule itself. Whenever a combination between two or more persons to do an unlawful act is shown, the acts and declarations of each, done and said during the pendency of the combination, in pursuance of the original concerted plan, and with reference to the common object, is legitimate evidence against the other. It makes no difference at what time any one entered into confederation, for immediately upon such entrance, his liability attaches as well for the past acts and declarations of his confederates as those occurring in the future, anterior to the final consummation of the enterprise. *Baker* v. *The State*, 7 Texas Ct. App. 612. There must be, however, some evidence introduced before the jury, prior to their retirement, from which it may be legitimately inferred that at the time the act of the confederate was done or his declaration made, by which it is sought to inculpate the party on trial, a combination had in fact been then entered into by the actor or declarant with some other person, to effect the common unlawful purpose; for if the act was done or the declaration made anterior to the formation of any conspiracy, it is significant only against the party himself and admissible only against himself. *Cox et al.* v. *The State, ante*, p. 254.

Ordinarily, the mere proof that two or more parties were actually engaged in the commission of a crime does not lead to the necessary inference that days, or weeks, or months before its commission they had mutually undertaken and agreed to its commission. It more often happens that such combinations are speedily made and the common purpose immediately executed; and it would be a doctrine fraught with mischievous results if the mere proof of an actual commission of a criminal act by two or more parties was sufficient, in itself, to justify the conclusion that a conspiracy had been formed a week or a month before by these same parties to commit the particular offence in ques-

tion.  A conspiracy, like crime itself, is susceptible of proof by circumstances, which are addressed to the trial judge in the first instance, when called to rule upon the competency of the testimony.  And after the acts or declarations of a co-conspirator not upon trial are admitted in evidence, and the evidence as to the existence of a conspiracy at the time such acts were done and such declarations were made is not conclusive, the question as to the existence of such conspiracy at the time of the acts or declarations should be submitted to the jury under appropriate instructions, with directions to disregard such evidence in case the conspiracy had not been established to their satisfaction.  *Ormsby* v. *The People*, 53 N. Y. 472.

In view of these principles, we are of opinion that the declarations of Reuben Loggins, if admitted at all, should have been submitted to the jury with an instruction embodying the law regulating that character of evidence, and the jury should have been told that before its consideration they should first determine, from all the evidence before them, that at the time such declarations were made, if any such declarations were made, Reuben Loggins had combined or agreed with some other person to slay the deceased.  Of course, if such conspiracy had an existence at the time of the declarations, and Henry Loggins joined in the unlawful enterprise only a few moments before its final consummation, such declarations are as legitimate evidence against him as against the person who uttered them.

In the further progress of the trial, the prosecution introduced in evidence, over objection of the defendant, the declarations of Reuben Loggins, made after the homicide, and when informed of it, which declarations were made in the presence of the accused, and were as follows: "Reuben Morris caused my son's death.  I said he should go dead; and now, you see, he is dead."  The witness further testified, over objection, as follows: " I told Capt. R. Loggins, in the presence of Henry and Williford, that Jim and I

wanted to go to see the body. He said we had best not go; that I might be questioned about this thing. He told me to keep my mouth shut."

It is assumed that the objections to this testimony were overruled because, although these declarations were made after the culmination and completion of the conspiracy, yet they occurred in the presence of the accused, and were therefore admissible against him. On general principles, this view would seem to be correct. Generally, the declarations of third persons, made in the presence and hearing of the accused, are admissible in evidence against him; but to this rule there are many well-defined exceptions. If the accused, at the time the declarations were made, was deaf, or intoxicated, or asleep, the rule does not obtain. Neither does it apply when the statements made do not properly call for a response from the accused. *The Commonwealth* v. *McDermott*, 123 Mass. 440; 2 Whart. on Ev., sect. 1138; 1 Greenl. on Ev., sects. 197, 199, 200, 233. We cannot understand how or why the accused, in this particular instance, was called upon to notice in any manner the declarations of Reuben Loggins as set out above. The conversation was not had with nor were the remarks addressed to himself, and any remark made by him pending the conversation might have been classed as impertinent. He was not called upon to say anything, and his silence under the circumstances cannot be indicative, even in a remote degree, of guilty complicity in the homicide, or assent to the remarks made in his presence. Had Reuben Loggins said, " I said he should die, and we have killed him," then it would have been incumbent on the appellant to immediately disclaim his participancy, and his silence would have justified a natural inference that the statement was true, else he would have repelled it. Whart. on Ev., sect. 1136. The testimony was incompetent, and upon objection should have been excluded.

The other errors assigned, and presented with great zeal

·and ability by counsel for appellant, are found, upon examination, either of an immaterial character, or in truth not errors in fact and in law. The charge of the court upon the law of circumstantial evidence presented clearly to the jury the principles which should govern them in reaching a conclusion upon that character of evidence, and it was not requisite that more should be done, even upon request of appellant's counsel. The law prescribes no exact formula of words in which a court is required to convey to the minds of a jury the nature and degree of conviction which must impress itself upon their minds before they are justified in convicting upon that character of evidence alone. The language employed is left to the selection of the court, and it is sufficient if, upon inspection here, it is found that the substance of the principle has been imparted to the jury in such manner as to impress itself upon their attention, and cause them to duly observe it in their deliberations. *Brown* v. *The State*, 23 Texas, 195.

Because of the admission of incompetent evidence, as herein indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*