# REPORTS

OF

# CASES ARGUED AND DETERMINED

## At January Term, 1858.

————————

### McHUGH *vs.* THE STATE.

[INDICTMENT FOR MURDER.

| 31 | 317 |
| 96 | 75 |
| 31 | 317 |
| 141 | 58 |

1. *Impeaching witness.*—A witness for the prosecution may be impeached by proof of his hostility to the prisoner; and if he denies such hostility on cross examination, it may be established by proof of his previous acts and declarations.

2. *Dying declarations.*—A statement written by an attorney during the night on which the deceased died, held not admissible as the dying declarations of the deceased, when it appeared that the attorney propounded questions to him, which he tried to answer, but was unable to do so; that his attendant friends then " explained the questions to him, and made the answers, to which he assented only by nodding his head;" that the statement, consisting of the answers thus made, was, when finished, " read over to him by the attorney, slowly and distinctly, and he signified his assent thereto by nodding his head;" " that he spoke but a few words afterwards, and had frequently to be aroused; and that he seemed, while the statement was being read to him, to be in a stupor."

3. *Same.*—To authorize the admission of dying declarations as evidence, the State must first prove to the court the existence, at the time they were made, of that despair of life on the part of the deceased, which is naturally produced by an impression of almost immediate dissolution, and which the law deems equivalent to a sworn obligation.

4. *Same.*—It is not essential to the admissibility of dying declarations, when reduced to writing, and signed by the deceased, that a subscribing witness thereto should be produced, or his absence accounted for.

APPEAL from the City Court of Mobile.

Tried before the Hon. ALEX. McKINSTRY.

THE prisoner was indicted for the murder of William Toomey, a police officer in the city of Mobile, who was stabbed in the neck, in August, 1857, while attempting to quell an affray, and died on the 14th day afterwards. Of the several rulings of the court on the trial, to which exceptions were reserved by the prisoner, it is only necessary to notice the following:

"One P. D. Carr, a policeman, was offered as a witness for the State, and was asked, on cross examination, if he entertained any unfriendly feelings towards the accused; to which he replied, that he did not. He was then asked, if he did not say, at the mayor's office, in the presence of H. Maury, the city marshal, and others, that he would do all he could to have the accused convicted; and that he would give $500 to have had his pistol, that he might have killed the accused. No objection was made by the State to this question, or to the witness answering it; and the witness answered, that he did not make any such statements. The prisoner's counsel afterwards offered said Maury, the city marshal, and one Anderson, who was present at the time, to prove that said Carr did make such statements. The counsel for the State objected to the introduction of this evidence, because no sufficient predicate had been laid to authorize its admission. The court sustained the objection, and excluded the evidence; to which the prisoner excepted."

To prove the dying declarations of the deceased, the State offered in evidence a statement, which had been reduced to writing by C. F. Moulton, and which is appended as an exhibit to the bill of exceptions, marked "No. 1;" accompanied by the testimony of said Moulton, as follows: "That he was an attorney-at-law, an alderman of the city, and a peace officer; that he was requested by the mayor of the city, on the night before the death of the deceased, to call on the deceased, and to get his dying declarations; that he called accordingly about 11 o'clock that night, and found the deceased very low; that his physician, who, with several of his friends, was present, said that he was dying, and such was witness' opinion; that the deceased believed he would die; and that the

written statement marked 'No. 1,' was taken down in this way: Witness would put questions to the deceased, who would try to answer them, but could not, being unable to speak more than a few words at a time. The friends of the deceased, who were standing around his bed, would then explain the questions, and make the answers; the deceased would assent them, by nodding his head; and witness would then reduce them to writing. After they were all taken down, witness read over the statement, slowly and distinctly, to the deceased, who signified his assent by nodding his head. He was then raised up in bed; some one held his hand, and made his mark. He spoke but a few words afterwards, and had frequently to be aroused, and seemed to be in a stupor while it was being read over to him. He died the next morning." On this evidence the court permitted the said statement to be read to the jury, against the prisoner's objection; "telling the jury, that they had heard from the witness the manner in which it was reduced to writing, and that they must take it for what it was worth, together with the testimony of said witness." To this ruling of the court the prisoner reserved an exception.

The State offered in evidence, against the prisoner's objection, another written statement containing declarations made by the deceased, on the testimony of Thomas Buford, the coroner of the county, by whom it was reduced to writing, and who testified in relation thereto, "that he called on the deceased, the night before he died, to receive his dying declarations; that the deceased said, at the time said statement was reduced to writing, that his physician had told him he would die, and that he believed he would if there was no immediate change for the better; that he reduced the statement to writing, and signed the name of the deceased to it at his request; and that one Philips was called as a witness to the signing of the statement, and signed it as a witness." Philips, the witness referred to, whose name is subscribed to the statement, was not called as a witness to prove it, although it was shown that he was in the county. The prisoner's counsel objected to this statement being read in evidence against

him, "1st, because it was not made under a sense of impending death, and the deceased had hope of recovery at the time; and, 2dly, because the witness Philips was not called to prove said statement." The court overruled these objections, and permitted the statement to be read in evidence to the jury; and the prisoner excepted to its ruling.

DAN'L CHANDLER, for the prisoner.—1. The court erred in ruling out the testimony of Maury and Anderson. A sufficient predicate was laid for the introduction of the evidence, the attention of the witness having been called to the time, place and persons involved in the conversation referred to.—1 Greenl. Ev. § 462, note; 2 Brod. & Bing. 313; Nelson v. Iverson, 24 Ala. 9.

2. The written statement which was admitted in evidence on the testimony of Moulton, as containing the dying declarations of the deceased, ought not to have been received.—Barb. Crim. Law, 505; Rex v. Fitzgerald, Irish Cir. Rep. 168.

3. The statement proved by Buford was obnoxious to both of the objections urged against it. That the sense of impending death was not sufficiently proved, see Rex v. Woodcock, 1 Leach's C. C. 502; Rex v. Spitsbury, 7 C. & P. 187; Rex v. Crockett, 4 C. & P. 544; Rex. v. Haywood, 6 C. & P. 160; Barb. Crim. Law, 55, 504; 1 Greenl. Ev. §§ 158, 365; 3 C. & P. 598. That the attesting witness ought to have been produced, or an excuse shown for his absence, see 1 Greenl. Ev. § 569; 2 ib. § 158; 4 East, 54; 2 Stark. Ev. 263.

M. A. BALDWIN, Attorney-General, contra.

RICE, C. J.—In considering the various modes by which the credit of a witness may be assailed, courts must observe the distinction between an attack upon his *general credit*, and an attack upon his *credit in the particular case*. Particular facts cannot be given in evidence to impeach his *general credit* only, but may be to affect his *particular credit*—that is, his credit in the particular cause.

Thus, the *general credit* of a witness for the prosecution may be unassailable; he may be hostile to the prisoner, and, on cross examination, may deny that he is so; in such case, who can doubt the right of the prisoner to prove the hostility? Its existence is a fact which cannot be proved by general reputation. When the witness denies it, it is in its very nature incapable of being proved otherwise than by his previous acts and declarations. It ought to be made known to the jury, because they are to weigh the testimony, and to determine the credit to which each witness is entitled; and because as full belief will not be readily yielded to a witness who entertains hostility to the party against whom he is introduced, as to one who entertains no such hostility.—1 Greenl. on Ev. § 450; 1 Starkie on Ev. (edition of 1826,) 135; 4 Phil. on Ev. (edition of 1850, by Van Cott,) 750–752; Yewin's case, 2 Camp. 638; Rixey v. Baise, 4 Leigh, 330; Atwood v. Welton, 7 Conn. R. 66; Daggett v. Tallman, 8 *ib.* 168; Somes v. Skinner, 16 Mass. R. 348; Tucker v. Welsh, 17 *ib.* 160; Melhuish v. Collier, 15 Ad. & Ellis, N. S. 878. Entertaining these views, we hold, that the court below erred in excluding the evidence of the witnesses Maury and Anderson, as offered by the prisoner.

2. We are also of opinion, that the court below erred in admitting the statement marked No. 1, as the dying declarations of the deceased. That statement was taken down by an attorney-at-law, who states the reason why he took it down, the time when, and the way in which he took it, the attending circumstances, and the physical and mental condition of the deceased at the time. It was taken down after 11 o'clock at night, and the deceased died next morning. The mortal wound had been given some two weeks previously. At the time the attorney went to take the statement, the deceased was dying. He was unable to answer the questions put to him by the attorney, although he tried to answer them. His attending friends took upon themselves to "explain the questions and make the answers." The only assent he gave to the answers thus made by his friends, to the questions as explained by themselves, was "*by nodding his head.*"

The statement consists of the answers thus made by the friends of the deceased, and thus assented to by him. After the statement was thus written out, the attorney read it over slowly and distinctly to the deceased. The only assent given to it by the deceased was "*by nodding his head.*" "The deceased spoke but a few words afterwards, and *had frequently to be aroused*, and seemed, *while it was being read over to him*, to be in a *stupor.*"

It is clear that the language of the statement is *not the language of the deceased;* and that the declarations contained in it are not his declarations, unless made so by his mere "nodding his head." If there was anything to convince us that he perfectly understood the language employed in the statement, or that he was at the time able to have detected any *erroneous inference* as to his real meaning, which his friends might have expressed in the answers given by them and embodied in the statement,— we should regard the assent given by nodding his head as sufficient. But we see nothing which satisfies us that he either perfectly understood the language, or was able to have detected *the erroneous inference* as to his meaning, which his friends may have honestly drawn in making the answers set forth in the statement. He was just in that condition, in which for the sake of peace, or to be rid of the importunity or annoyance of those around him, the probability is, he would assent to, or seem to say, whatever they might choose to suggest. Such an assent, obtained under such circumstances, by the friends on whom he relied,—not merely to a translation of language he himself had uttered to express his meaning, but to *their inferences* as to his meaning, couched in *their own language*, or in the language of the attorney who took down the statement,—cannot safely or legally be held sufficient to give to the statement thus assented to the force and effect of dying declarations, in a cause involving the life or liberty of a human being.—1 Greenl. on Ev. §§ 156, *et seq.;* see, also, authorities cited for the prisoner.

3. It seems to us that the evidence is not as full as it might be, in relation to the hope of recovery or despair of life on the part of the deceased, at the time he made

the declaration embodied in the statement written out by coroner Buford, and marked No. 2. For that reason, and the additional one that the judgment must be reversed for the errors already pointed out, we decline now to decide whether or not there was error in admitting those declarations. But we deem it proper to remark, that they are not admissible, unless the State first proves to the court the existence of that despair of life on the part of the deceased, at the time he made them, which the law deems equivalent to a sworn obligation; that despair which is naturally produced by an impression of almost immediate dissolution, a dissolution so near as to cause all motives to falsehood to be superseded by the strongest inducements to strict veracity.—3 Phil. on Ev. (edition of 1850, by Van Cott,) 251–255.

4. It is not essential to the *admissibility* of those declarations, that Philips, who signed his name as a witness to said statement No. 2, should be produced, or his absence accounted for.

For the errors above pointed out, the judgment of the court below is reversed, and the cause remanded; the prisoner must remain in custody until discharged by due course of law.