## George Warren v. The State.

1. **Declarations as Res Gestæ.** — In a trial for murder, a State's witness was allowed to testify that from a distance of a hundred and fifty yards he saw the deceased when he was shot and fell, and that he went immediately to the deceased and inquired how he shot himself, and deceased re-

plied, "I did not do it; I was shot from up yonder," and indicated by a motion that he meant from an adjacent mountain. *Held*, that this testimony was legitimate as proof of *res gestæ*, and was therefore admissible without the predicate necessary to the introduction of dying declarations.

2. DYING DECLARATIONS may be communicated by the deceased otherwise than by articulate speech; but, however expressed, they must relate facts which the deceased, if himself the witness, would be competent to attest.

3. SAME. — It is only *ex necessitate* that dying declarations are held admissible to prove such facts as the *res gestæ*, the identity of the culprit, and the like. They are not competent to prove former or extrinsic transactions, nor to show the mere opinion or belief of the deceased; and, *à fortiori*, a witness's opinion as to what the deceased meant by an indefinite expression is not competent evidence. See the opinion for illustrations of these rulings.

4. SEPARATION OF A JURY before verdict, after it has been sworn and empanelled to try a felony case, is positively prohibited by the Code of Procedure, unless by permission of the court, with the consent of the State's counsel and the defendant, and in charge of an officer. It is the officer's duty to supply their necessary food and lodging.

5. VERDICT — NEW TRIAL. — The jury found the accused guilty of murder in the second degree, and assessed the term of his confinement in the penitentiary at the average of their several assessments. It does not appear that the jurors agreed in advance to abide the result of the computation. *Held*, not a verdict "decided by lot," nor cause for new trial, but not a commendable procedure.

6. INSANITY. — In criminal cases a higher degree of insanity is requisite to exculpation than that necessary to avoid contracts. Ability to distinguish right from wrong as to the act in question is the general test of amenability.

7. SAME — EVIDENCE — CHARGE OF THE COURT. — Evidence of the state of the defendant's mind since the commission of the act is competent; and, in a trial for murder, when such evidence was adduced, but was ignored in the general charge, it was error to refuse a special instruction which would have correctly submitted the evidence to the jury.

APPEAL from the District Court of Travis. Tried below before the Hon. E. B. TURNER.

The indictment charged the appellant with the murder of Augustus Miller, in Travis County, on the fifth day of June, 1879. The verdict was, guilty of murder in the second degree, with his punishment fixed at twenty-five years in the penitentiary.

T. A. Doxey testified, for the State, that he knew both the accused and the deceased. He saw Miller at his camp on the fifth day of June, 1879, dead. He saw the accused at his (witness's) camp the night before he saw Miller in his (Miller's) camp dead. Witness was camped about one hundred and fifty yards above the house of the accused, on the Colorado River, near Mount Bonnell. About eight o'clock P. M., the accused came to witness's camp and asked for Chappell's gun, inquiring at the same time if it was loaded. Witness handed him the gun, a large-bore musket. The accused, saying that he supposed it was loaded with fine shot, fired it off and then loaded it with an oblong ball in a paper cartridge. Accused did not stay long in camp, and witness does not recollect that he made any statement while there as to what he intended to do with the gun. If he was excited, his excitement did not attract the attention of witness. The accused owned a gun of about the same calibre, but if he had it with him witness did not notice it. Witness next saw the accused about seven o'clock next morning. He was coming down the river in a boat which he owned, but which, having been rented by witness, was under his control. Witness did not know that accused had taken it during the night. Accused landed at the fishing-ground and came up to camp, having the muskets with him. He asked if witness and others in camp had heard the news, saying that one of the fishermen up the river had shot himself. He then asked for a razor, and, Mr. Chappell having supplied him, witness proceeded to shave him. While being shaved, he said that the man who had shot himself was Gus Miller, the man who had threatened to " fix him," the accused. Witness remembers no further conversation that transpired at the time.

The cross-examination of this witness developed nothing further than that the defendant, having borrowed a five-shooter pistol from the witness on the evening before the killing, said that he was afraid the deceased and the other

man would ambush him, and he wanted something that would shoot more than once.

The material fact of the testimony of O. K. Chappell, for the State, in addition to that of the last witness, whom he substantially corroborated, was to the effect that, about two weeks before the killing, the accused and the defendant had a difficulty, on Pecan Street, in the city of Austin, near the iron bridge, about $3 that the deceased wanted the accused to pay him. Accused wanted the deceased to take a boat for the amount, and finally grew angry and offered to fight. They separated, finally, with the understanding that deceased was to look at the boat next morning. The next morning the accused paid Miller, overpaying him five cents, the boat going in as part payment. Accused called deceased to one side, and they had a short talk, which witness did not hear. Accused, however, patted his breast and told the deceased that he could whip him, and finally kicked the deceased, who admonished him not to repeat the kick, and then said, "Yonder is Mrs. Warren; ask her, and if she says I did that, you can kick me all over the place." Accused offered then to go across the river and fight it out, but the deceased refused to go, replying that he would see the accused again. When deceased started off, the accused said he would kill the deceased. Accused then went to his house, got his gun, and went up past the deceased's camp. The two got into a conversation, which lasted a few minutes. About three hours later, the deceased moved his camp about two miles up the river, where he was killed. Accused, during these two difficulties, was in a passion, and appeared very much excited. Witness never again saw the parties together. When, after this last difficulty, the accused took his gun back to the house, he called to witness and said that he had been a little hasty; that the d—d scoundrel would have him arrested, and that witness would be the main witness against him. He said to witness, "You heard him say he would fix himself for

me." Witness replied that he did not say that, but did say that he would see the accused again. Accused grew angry with witness for not agreeing with him about what the deceased said.

The cross-examination disclosed that a partnership had been arranged between the deceased and a man named Estes, who had previously worked for the accused and had been discharged. Mrs. Warren, the wife of the accused, had sent witness to Estes to tell him to leave, saying that the accused had told her that Estes had hung his coat and hat on both posts of her bedstead, and on the rack between the beds, and that he was mad about it. Witness sent this word to Estes by the deceased, or asked the deceased to tell Estes. At the difficulty between the accused and the deceased on Pecan Street, the accused asked deceased why he had taken Estes in partnership, knowing that he (the accused) did not want the dirty dog about the neighborhood. Deceased replied to the accused that he (the deceased) was not mad with him for taking Estes in partnership, but because he (the deceased) wanted his pay. After other talk, the accused took the deceased off to one side and accused him of "hunching" his pants and his privates in the presence of the wife of the accused.

W. J. Estes testified, for the State, in substance, that at the time of the killing, himself and deceased were partners in the fishing business, pursuing their avocation on the river in the neighborhood of Mount Bonnell. Deceased was shot from the side of the mountain, about six o'clock A. M. on the fifth day of June, 1879. Witness had crossed the river to attend his horse, and was on the other side, when he heard the report of a gun, and the deceased exclaim, " Oh, Lordy ! I am shot ! " He saw no one but Mr. Luckett, who was lower down the river, at the water's edge. Witness started to Miller, and met Mr. Mills and a little boy, who heard Luckett call out that witness's partner had shot himself. Witness, Mills, and the boy crossed to the camp where the

deceased was.  He took witness by the hand, and witness saw that he had been shot in the right side, the ball passing through his body and striking a rock.  On examining the mountain, the party found where a man had come down the mountain side, in a little trail, to a cedar tree.  From the tracks, it was evident that the man had stopped at the cedar tree and gone back the same way.  The distance from the tree to the camp, where the deceased was shot, is about twice the width of the Travis County District Court room. The cedar tree was higher up than was the camp.  The tracks came from the top of the mountain, and were made by an ordinary brogan.  The trail down the mountain, followed to the tree by the tracks, would lead within twelve or fifteen steps of the camp of the deceased.  Going down the mountain, the trail would strike the river about fifty yards below the camp, and any one going down the trail to that point could have been seen from the position occupied by witness.  There were some willow trees, that would screen a person, just below the point where the trail strikes the river.  A person coming to the camp in a skiff, stopping a half-mile above the house of the accused and a mile and a half below the camp, could reach the top of the mountain, by going through a corn-field, without being seen from camp.  Mount Bonnell ford is a mile and a half below the camp.  A man landing there, or below there, could reach the top of the mountain without being seen.  There was a rock quarry on the side of the mountain, at which two men were working.  One of these had gone for a bucket of water.  Witness saw one man making a line in the middle of the river; saw no one else but James Haig, who had the bucket of water.  When witness and Mills reached the camp from across the river, W. H. Luckett and Box were there. Deceased was lying flat on his back.  The flesh on the under side of the right arm was burned as if by a bullet, but witness saw no powder-burn about the body.  When witness left the camp, he left a loaded six-shooter under the head of

his bed, and it was the only weapon in camp.   It was still
there, not having been touched, when witness returned.
When witness reached camp the deceased said to him,
"Bill, that fellow shot me from the bush."   Witness, when
he raised him up, asked if he was badly hurt; and deceased
told him to lay him down, that he was "bound to die."
Witness gave him a drink of water and went for a doctor.
When he got back the deceased was dead.   He was per-
fectly rational up to the time that witness left him.   Witness
did not know the state of feeling existing between the ac-
cused and the deceased, but knows they had previously had
some little difficulty.   The substance of the remainder of
the testimony of this witness was to the effect that he had,
previous to his partnership with the deceased, been in the
employ of the accused; that he hung his coat and hat on a
gun-rack in the room occupied by accused and his wife, in
which witness also slept; that on one occasion, when the
wife of defendant came into the room after night, he called
to her to ascertain who she was, two or three times, before
she answered; that he had heard that the accused was jeal-
ous of him; and that on one occasion the accused cursed
him violently, and threatened to kill him.

James Haig testified, for the State, that at the date of
the killing he was engaged in quarrying rock at the Mount
Bonnell ford.   On the morning of the killing he had gone
to a spring, about half a mile distant, to get a bucket of
water, and on returning to his camp, at about 6 : 30 o'clock
A. M., he met the witness Estes travelling down the river
towards town.   After witness passed Estes, he met the ac-
cused, walking, about three hundred yards behind Estes,
down the river, towards town.   Witness was going up.   Ac-
cused lived down the river, but on the opposite side.   He
had two guns and a butcher-knife.   Accused saluted witness
with "Good morning."   He was walking fast, but witness
noticed nothing strange or excited about his behavior.   He
met the accused about one and a half miles from the camp

of the deceased. He went up to the camp about ten o'clock A. M., and saw Miller there, dead.

B. T. Gibson testified, for the State, that between six and seven o'clock A. M., on June 5th, he was fishing in the river about half a mile above the house of the accused. Accused came down the river in a boat, passing within about thirty yards of witness. He asked if witness had caught any fish, and did not appear strange or excited. He had two army guns in the boat.

W. H. Luckett, for the State, testified, in substance, that when the killing occurred he was about two hundred yards distant from the camp of deceased. He heard the report of a gun, and, looking up, saw the deceased fall. Witness's first impression was that the deceased had shot himself. He at once went up to the deceased, who lived about two hours. No one was with him when witness reached the camp, and witness saw no one, and would have seen any one on the rock with deceased if any one had been there with him. The side of the mountain was brushy, and no one could see more than twenty yards beyond the deceased up the mountain side. Witness asked the deceased, "How in the world did you do it?" Deceased answered, "I never did it; it was done from up there," indicating one side of the mountain. Box was the next to reach the camp, Mrs. Box next, then Mills and Estes and Mr. Smith. Box asked deceased, in presence of witness and Smith, who he thought shot him. Deceased replied, "I know that George Warren did it," and added that accused had threatened his life before, but he did not think that he (Warren) would take such advantage. When Estes reached the deceased, he asked him, "Gus, how are you?" Deceased responded, "He has got me." Witness then asked Estes who the deceased meant, and Estes answered, "George Warren. He threatened his life, and mine too." This witness did not think the shooting could have been done from the cedar tree, as it was not on a line with the body. There was a rock, breast-high,

about ten paces distant from the tree, and which was on a line with the body. Noticed, around the rock, evidences of the surface of the ground being disturbed by somebody tramping around.

A great number of witnesses were examined by the defence, and each witness testified to exceedingly peculiar habits of the accused, that indicated insanity or monomania. Several of the witnesses testified emphatically that in their opinion the accused had been for years of unsound mind, and unable, when under the influence of a " spell," to distinguish right from wrong. Others believed he was sane enough to distinguish right from wrong. Some of them testified that the accused believed that Estes and the deceased exercised a superhuman influence over his wife, which she was unable to resist, and that they debauched her at will. The wife, in addition to these hallucinations of the accused, testified that on two occasions, when she encountered the deceased on the river, he displayed his privates to her, and advanced on her, and that she had informed her husband.

*N. G. Shelley*, *Sheeks & Sneed*, and *W. H. D. Carrington*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

WHITE, P. J. When the witness Luckett, who was one hundred and fifty yards off, heard the shot and saw the deceased fall, he immediately went to the spot and asked the deceased, " How in the world did you shoot yourself ? " To which deceased answered, " I did not do it; I was shot from up yonder," meaning by " up yonder " from the side of the mountain, as the witness understood from some motion then made by deceased. These declarations were *res gestæ*, and properly admitted, and it was not necessary that a predicate should first have been laid for their intro-

duction as dying declarations. " Where the declarations of the injured party are part of the res gestæ, they are admissible without proof of a consciousness of approaching death." Whart. Cr. Ev. (8th ed.), sect. 296. But it is objected that the witness should not have been allowed to state that by " up yonder," from a motion made by deceased, he understood him to mean from the side of the mountain. It is to be noted that before Luckett was put upon the stand as a witness, a proper predicate had been laid through the witness Estes to prove dying declarations ; so that this portion of Luckett's evidence was, in fact, both res gestæ and dying declarations. With regard to dying declarations, the rule is that " it is not essential to admissibility that the statement should be formally expressed in words. T., being at the point of death, and conscious of her condition, but unable to speak articulately in consequence of wounds inflicted upon her head, was asked whether it was C. who inflicted the wounds ; and if so, she was requested to squeeze the hand of the person making the inquiry. It was held that, under all the circumstances of the case, there was proper evidence against C. for the consideration of the jury, they being the judges of its credibility, and of the effect to be given to it." Id., sect. 293. "And signs made by deceased have been admitted, when they go to affirm a prior formal statement." Id., sect. 287. Whilst it is true that dying declarations are admissible only as to those things to which the deceased would have been competent to testify if sworn in the cause, and must therefore speak to facts only, and not to mere matters of opinion (1 Greenl. on Ev., sect. 159 ; *Lister* v. *The State*, 1 Texas Ct. App. 739), the testimony objected to was a fact of which the deceased could have testified, had he been upon the stand ; for it certainly would have been permissible to allow the witness upon the stand to testify that he was shot from the side of the mountain.

But there was error in permitting the proof of the other declarations of the deceased which were objected to. This

relates to what occurred, and the statement made afterwards to the witness Box. When Box arrived, he said to deceased, "Who do you think shot you?" to which the deceased replied, "*I know George Warren shot me, for he threatened me.*" And this same objection, as we will see, goes to a portion of the evidence of Luckett, as to what occurred after Estes reached the dying man. "Estes approached and took hold of the hand of the deceased, and the deceased said to Estes, 'He has got me.' I [the witness] then asked Estes, 'Who does he mean by saying, 'He has got me'? *Estes replied, 'He means George Warren, for he has threatened both of us.'* "

"Dying declarations are admitted, from the necessity of the case, to identify the prisoner and the deceased, to establish the circumstances of the *res gestœ*, and to show the transactions from which the death results. When they relate to former and distinct transactions, they do not come within the principle of necessity. Therefore, it seems that dying declarations by a party that the prisoner had two or three times previously attempted to kill him, are not admissible. And so they are inadmissible when they go to show old malice on the part of the prisoner to the deceased." Whart. Cr. Ev., sect. 278. "Nothing can be evidence in a declaration *in articulo mortis* that would not be so if the party were sworn. On this rule, anything the murdered person says as to facts is receivable, but not what he says as matter of opinion or belief. Hence the declaration, 'It was E. W. who shot me, though I did not see him,' is inadmissible." Id., sect. 295; *Nelson* v. *The State*, 7 Humph. 542. And where the deceased had been shot at night by some unknown person, his dying declarations, to the effect that the prisoner, who was one of his employer's slaves, was the only slave on the place who had enmity against him, were held incompetent and inadmissible evidence as against the prisoner. *Mose* v. *The State*, 55 Ala. 422.

A like objection holds good to that portion of Luckett's testimony as to Estes' reply when he (the witness) asked Estes whom the accused meant when he said, " He has got me," and Estes' reply, " He means George Warren, for he has threatened both of us." If this testimony was inadmissible had it come directly from the mouth of deceased, as we have seen would have been the case, from the above authorities, *à fortiori* it is much more objectionable when coming from a third person, and that, too, as mere inference or opinion of such person as to his meaning. *McHugh* v. *The State*, 31 Ala. 317 ; *Barnett* v. *The People*, 54 Ill. 325.

Two questions of misconduct are raised with regard to the jury : First, that they were allowed to separate during their deliberations ; second, that they arrived at and determined the verdict by lot.

It seems that several of the jurors were permitted at different times by the court, and in some instances with consent of the attorneys for the State and defendant, to leave their fellows and go in charge of an officer to a distant portion of the city, some for tobacco and others for a necessary change of clothing. Why the bailiff, or officer having them in charge, could not as well have attended to the matters, or had the matters attended to by others, without taking the jurors off with him from the jury-room, we cannot imagine. We cannot understand why he could not have sent out for tobacco and a change of clothing for the individual jurors, without taking them off for a long time from the jury to get such articles. Our statutes are very plain and emphatic upon the subject. They provide that, "After the jury has been sworn and empanelled to try any case of felony, they shall not be permitted to separate until they have returned a verdict, unless by permission of the court, with the consent of the attorneys representing the State and the defendant, and in charge of an officer." Code Cr. Proc., art. 687. " It is the duty of the sheriff to

provide a suitable room for the deliberation of the jury, in all criminal cases, and to supply them with such necessary food and lodging as he can obtain; but no spirituous, vinous, or malt liquors of any kind shall be furnished them." Id., art. 689. "No person shall be permitted to be with a jury while they are deliberating upon a case, nor shall any person be permitted to converse with a juror after he has been empanelled, except in the presence and by the permission of the court, * * * and in no case shall any person be permitted to converse with the juror about the case on trial." Id., art. 690.

In one of the instances mentioned in the record, two of the jurors were taken off by the deputy-sheriff to the home of one of them, where they remained from twenty minutes past twelve o'clock A. M. until after four o'clock P. M., a portion of which time they were separated even from the officer pretending to have them in charge, and the balance of the time was spent with the family of the juror, with whom they conversed and ate dinner, after which they spent several hours in playing billiards. It is true, they swear that they conversed with nobody about the case; still, such conduct upon the part of jurors and officers is a plain violation of the spirit and letter of the statute, and should not be tolerated in grave cases affecting the life or liberty of the citizen, when not only the defendant but the State also demands that the verdict of the jury shall be above suspicion, and command full faith and confidence. *Early* v. *The State*, 1 Texas Ct. App. 248.

According to previous decisions, the method adopted by the jury for determining the punishment to be assessed against the defendant, after his guilt had been agreed upon, is not obnoxious to the objection that the verdict was "decided by lot, or in any other manner than by a fair expression of opinion by the jurors," which is one of the grounds for a new trial named in the statute. Code Cr. Proc., art. 777; *Leverett* v. *The State*, 3 Texas Ct. App. 213; *Hand-*

*ley* v. *Leigh*, 8 Texas, 129. Still, such a mode of settling their differences of opinion with regard to the punishment is not to be commended, and the affidavit of a juror seeking to impeach his own verdict in this respect, or indeed in any other similar respect, has always been highly reprobated by the courts.

Upon the defence relied on, which was insanity and mental hallucinations and delusions, the charge of the court is complained of as insufficient and erroneous, as is also the refusal to give upon those subjects certain requested instructions submitted by defendant's counsel.

In the main, the charge was correct, being almost a literal copy of the doctrine enunciated by Mr. Greenleaf, and recognized as correct by the weight of authority in this country. Mr. Greenleaf says : "In criminal cases, in order to absolve the party from guilt, a higher degree of insanity must be shown than would be sufficient to discharge him from the obligations of his contracts. In these cases the rule of law is understood to be this : that a man is not to be excused from responsibility if he has capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he is then doing; a knowledge and consciousness that the act he is doing is wrong and criminal will subject him to punishment. In order to be responsible, he must have sufficient power of memory to recollect the relation in which he stands to others and in which others stand to him ; that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty. On the contrary, although he may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences ; if he has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment, such partial insanity is not sufficient to exempt him from

responsibility for criminal acts. If, then, it is proved to the satisfaction of the jury that the mind of the accused was in a diseased and unsound state, the question will be whether the disease existed to so high a degree that for the time being it overwhelmed the reason, conscience, and judgment, and whether the prisoner, in committing the homicide, acted from an irresistible and uncontrollable impulse ; if so, then the act was not the act of a voluntary agent, but the voluntary act of the body without the concurrence of a mind directing it." 2 Greenl. on Ev., sect. 372 ; *Carter* v. *The State*, 12 Texas, 500 ; *Thomas* v. *The State*, 40 Texas, 60 ; *Webb* v. *The State*, 5 Texas Ct. App. 596.

We are of opinion, however, that the court erred in refusing to give in charge the fifth special instruction requested, in the following terms : " That, in determining the insanity of the defendant at the time of the killing of Miller (if the defendant did kill Miller), the jury are authorized to look at all the facts and circumstances in evidence before them relating to the question of defendant's sanity — that is, all the facts and circumstances relating to the defendant's mental condition after and since the killing, as well as the facts and circumstances relating to defendant's mental condition before the killing."

Testimony that defendant had exhibited evidences of insanity since the homicide, and up to the time of trial, as well as before the killing, had been adduced and properly laid before the jury, and the jury should have been instructed that they were to consider it, along and in connection with the other testimony, in arriving at their conclusion ; for it is a rule of law that " evidence of the state of the mind of the party, both before and after the act done, is admissible in determining the question of sanity." 2 Greenl. on Ev., sect. 371 ; *Webb* v. *The State*, 5 Texas Ct. App. 596.

Several other errors are claimed to have been committed on the trial, but we have noticed and discussed all which

we deem important or tenable; and, on account of those which we have pointed out and discussed, the judgment of the District Court will be reversed and the cause remanded for another trial.

*Reversed and remanded.*