[Carmichael v. The State.]

# Carmichael *v.* The State.

### Murder.

(Decided April 13, 1916.  Rehearing denied June 30, 1916.
72 South. 405.)

1. **Homicide; Evidence; Dying Declaration.**—Where, after being shot, deceased stated that he was going to die, and requested that his pain be eased, his statement that defendant shot him was admissible as a dying declaration, and such declaration was material and relevant.

2. **Same.**—Where a purported dying declaration was offered, the question whether the declarant had sufficient mental capacity, is a question for the court instead of for the jury.

3. **Same.**—The fact that deceased, when he made the declaration, had received a mortal wound, was suffering great pain, and was in a state of physical collapse, does not show his mental incapacity, and render a dying declaration inadmissible, but goes to the weight that should be attached to such declaration.

4. **Witnesses; Cross Examination; Scope.**—While, for the purpose of discovering fabrications, considerable latitude in cross examination should be allowed, the court exercises its discretion as to the scope of such cross examination, and as collateral inquiries tend to distract the mind of the jury, the refusal of the court to permit the defendant to cross examine the station agent as to the existence of an electric bell wherewith to call porters, was not error, said station agent having testified that he observed the difficulty on the outside of the station, while he was on the outside to summon a negro porter.

5. **Homicide; Evidence.**—Where the son of defendant had had a difficulty with deceased, came to defendant's place of business and requested a pistol, stating that he had had the difficulty, and defendant armed himself and went to a store where deceased had gone, and there shot deceased, evidence that on the way to the store the son had one of his arms in a sweater, was admissible as tending to show that the son was armed.

6. **Same.**—Evidence that the son of defendant requested defendant to furnish him with a pistol, and that the two went together to the place where deceased was killed, was admissible as tending to show concert of action on the part of defendant and his son.

7. **Same.**—Evidence that defendant had stated that if he caught deceased looking through his window again he would kill him, is admissible to show criminal intent, notwithstanding the conditional character of the threat.

8. **Same.**—Where the state contended that defendant opened fire on deceased while deceased was behind a counter in the store, using a telephone, and defendant contended that he shot in self defense because deceased was advancing on him, evidence that after the shooting deceased fell behind the counter, and at his request was assisted to a point outside of the counter, where he lay upon the floor, was admissible to show that deceased was moved from behind the counter after the shooting, and to show his condition at that time.

[Carmichael v. The State.]

9. Same.—The request of deceased for help after the shooting was admissible to show his condition after the shooting, and also as part of the res gestae.

10. Appeal and Error; Harmless Error; Evidence.—The sustaining of an objection to a question as to the conduct of deceased at the time of the killing, was not error, or if error, was harmless, where immediately afterwards the witness was allowed to go into full particulars as to the matter.

11. Witnesses; Examination; Cross.—Where defendant killed deceased as a result of a difficulty between deceased and defendant's son, it was not error to permit defendant to be cross examined as to his knowledge of the whereabouts of his son up to the time of the killing.

12. Trial; Conduct of Judge.—A statement by a judge concurring in the assertion of counsel that a question had been asked six times, and his remark after a reservation of exception, that the record would so show, does not tend to show bias or prejudice.

13. Same; Statement of Counsel; Obligation.—Where a part at least of the statement of the prosecutor was justified by the evidence, an objection going to the whole statement was properly overruled as the objection should have been limited to the part not supported by the evidence.

14. Homicide; Instructions.—An excerpt from the charge that if defendant was prompted by malice in taking the life of deceased, he would be guilty of murder in the second degree, is not a mis-statement of the law in such sense as to constitute error.

15. Inditment and Information; Offenses Included.—Where the indictment charged murder in the first degree, defendant may be convicted of any lesser degree of homicide which the evidence may establish.

16. Homicide; Murder; Malice.—Where willfulness, deliberation and premeditation were also shown, a conviction of murder in the first degree may rest upon implied malice.

APPEAL from Houston Circuit Court.

Heard before Hon. H. A. PEARCE.

Dan Carmichael was convicted of murder, and he appeals. Affirmed.

The facts and objections to evidence sufficiently appear from the opinion. The following charges were refused to defendant:

(1) The court charges the jury that all the necessary and material allegations of the indictment should be proven beyond a reasonable doubt, and, if the state has failed to do this, then defendant should not be convicted.

(2) The court charges the jury that malice is an ingredient of murder in the first degree, but such mailice is not the malice imputed by the use of a deadly weapon.

(3) Malice as an ingredient in the offense of murder in the first degree is not implied malice, or that malice that is imputed in the law by the use of a deadly weapon.

[Carmichael v. The State.]

E. H. HILL, and ESPY & FARMER, for appellant.  W. L. MAR-
TIN, Attorney General, and LAWRENCE E. BROWN, Assistant At-
torney General, for the State.

SAYRE, J.—Defendant was jointly indicted with his son
David Carmichael for the murder of Horry Deshazo.  A sever-
ance was ordered, and defendant alone was on trial.  Defendant
was convicted of murder in the first degree and sentenced to im-
prisonment in the penitentiary for life.

(1-4)  Some minutes after receiving mortal wounds, deceased
made a statement concerning the agency of defendant in their
infliction and the attendant circumstances.  The physician to
whom the statement was made testified that deceased had re-
quested that nothing be done for him but to ease him; that he be
not moved; that he was going to die; that he would not live.
Deceased, however, requested the witness to do what he could for
him.  Witness testified that deceased then made a statement as
to how the shooting occurred.  To quote the witness:

"He said he was in the grocery store telephoning, and that
Dan Carmichael came in on him and shot him.  I don't remember
that he said which Carmichael it was that killed him."

There was no objection to this evidence.  On cross-examina-
tion the witness stated that when he started to carry deceased
to the infirmary he offered no protest, but did what he could to
aid his removal.  After deceased reached the infirmary, he said
nothing more about dying, but asked for help.  He asked the wit-
ness to ease him; asked the witness to give him medicine and to
ease him.  This was in substance the testimony of this witness
as to the expressions of the deceased.  This witness had, however,
previously described the four wounds from which deceased suf-
fered, and had stated his opinion that one of them was fatal.
Previously, also, the wife of deceased had testified to a statement
by deceased which appears to have been received without objec-
tion as a dying declaration.  She testified that at her home, where
deceased was when the physician first saw him, deceased had
expressed no hope for living, but said he was going to die; said
that he wanted relief; said that he was suffering death and
wanted to die easy.  On this status of the evidence, defendant
moved the court to exclude the testimony of the physician wit-
ness as to the declaration of deceased in regard to the facts and
circumstances of the shooting, on the ground that said testimony

was illegal, immaterial, and irrelevant. The predicate for the admission of the declaration of deceased as a dying declaration was well laid (*Gerald v. State*, 128 Ala. 6, 29 South. 614, and cases cited), and it is entirely clear that the evidence was both relevant and material. Appellant cites *McHugh v. State*, 31 Ala. 317; *Mitchell v. State*, 71 Ga. 128; and 4 Ency. Ev. 933. It was for the court to say whether the declarant had at the time sufficient mental capacity to make the declaration (4 Ency. Ev. 933), and it follows from the ruling made that the trial court found no sufficient reason for holding that the declarant was mentally incapable. The declaration being in rational and intelligent form, the fact that the declarant had been mortally wounded, suffered extreme pain, and was no doubt in a state of great physical collapse, was no sufficient reason for adjudging him to be mentally incapacitated. If these circumstances may have affected the credit of the declaration, that was a matter for the jury. The declaration in *McHugh v. State* was held inadmissible because it was shown that the declarant's mental capacity had been greatly impaired by sickness and he appeared to be in a stupor, in monosyllables and by nodding his head answering questions put to him by an attorney with a view to eliciting a statement for future use. The court held substantially that the statement obtained under these circumstances was more the statement of the attorney than of the deceased and should have been rejected. In *Mitchell v. State*, the court found on the evidence that the deceased was at no time in such a condition as to be able to give an intelligent account of the transaction or to enter into any detail, however general, of the attending circumstances. These cases, because of their evident and essential differences from the case in hand, have no effect on our judgment, which is that there was no error in overruling the motion to exclude.

(5) The witness Ghent, who was a ticket agent for the railroad at Dothan, testified to a difficulty between deceased and David Carmichael at the station a few minutes before the killing. As explaining his presence at the place without the building from which he observed the difficulty, this witness was led by the prosecution to say that he was there looking for a negro porter. On cross-examination defendant proposed to show that the witness had an electric bell in his office with which to call negro porters. The witness may have had any number of good

[Carmichael v. The State.]

reasons for going out to look for the porter notwithstanding he had the bell at hand, and we are unable to see how the inquiry could have discredited or otherwise materially affected his testimony or the issues involved. The question might have been allowed under the general license of cross-examination, which is indulged for the reason that it is the most "efficacious means available for the exposure of artful fabrications of falsehood by witnesses in our courts of justice."—*Davis v. Hays*, 89 Ala. 563, 8 South. 131. On the other hand, when extended to inquiries concerning remote collateral facts, it tends to excite and foment irrelevant and immaterial controversies, consuming the time of the court and distracting the attention of the jury. In respect of such matters, therefore, the court exercises, on grounds of public policy, a large measure of discretion. In the case made by this record no special reason for extending the cross-examination to the remote collateral fact inquired about appeared in either the testimony of the witness or the general atmosphere created by the contentions of the parties, and we are clear to the conclusion that there was no error in the trial court's exercise of its discretion in sustaining the state's objection.

(6) Evidence for the state went to show that, immediately after the difficulty between deceased and David Carmichael about which Ghent and other witnesses testified, David went to the defendant in his place of business, a restaurant in the neighborhood, where he asked for a pistol, and told his father of the difficulty he had had with the deceased; that after a few minutes the two went together in the direction of a store into which deceased had gone in the meantime; and that defendant there killed deceased by shooting him with a pistol under circumstances wholly lacking any element of legal justification or excuse. The state was allowed to ask a witness: "Now, when the Carmichaels— Dave and Dan Carmichael—came out of the restaurant and went down the sidewalk, in what position were Dave Carmichael's hands?" And the answer went to the jury: "One hand was in the waist of his sweater, and I don't remember where the other hand was." This evidence was either of no consequence utterly, in which case its admission or rejection was of no consequence, or it tended to show that David had a weapon. It is on the hypothesis that the jury may have inferred from the fact proved that David was armed that defendant complains of the ruling by which it was admitted. But there was no error. The jury,

on the tendencies of the evidence that has been noted and other evidential circumstances stated in the record, may well have found that defendant and his son were fatally bent upon mischief and acting in concert upon a common purpose to take the life of deceased. This, on familiar principle, justified the admission of the evidence against the defendant on trial.—*Amos v. State,* 83 Ala. 1, 3 South. 749, 3 Am. St. Rep. 682.

If the fact that David Carmichael asked for a pistol at defendant's restaurant tended to illustrate only the conduct of David, as counsel for defendant assumes the case to be, the objection to its admission in evidence would be obvious. But it had an environment that made it efficient in explaining the subsequent course of defendant. The request for a pistol was in the same breath with the complaint against Deshazo and was made, if not to defendant, at least in his hearing and presence. In good reason the jury may have found it to be the first step towards an understanding for concerted action against the life of Deshazo. It went to show upon what occasion and with what animus defendant made himself an active party to the situation that led up to Deshazo's death. This testimony was properly admitted.— *Martin v. State,* 89 Ala. 115, 8 South. 23, 18 Am. St. Rep. 91.

(8) The testimony of the witness Green that he heard defendant say, before the killing, that if he saw Deshazo looking through his window again he would shoot his head off, was clearly admissible as a threat evincing criminal intent. That it was conditional did not affect its admissibility. If its form derogated from its probative force, that was a question for the jury.— *Cribbs v. State,* 86 Ala. 613, 6 South. 109.

(9, 10) Saliba, a witness for the state, was in the store when and where defendant killed Deshazo. Among other things, he testified that immediately after the shooting he went to Deshazo, who was lying on the floor in a narrow space between a show case and the wall where the telephone was. Evidence for the state went to show that defendant had opened fire upon deceased while the latter was using the telephone, and that deceased had fallen to the floor at that place. Over defendant's objection this witness was allowed to testify as follows: "He (Deshazo) said, 'Help me up.' I catch hold of his hand trying to raise him up, and he could not get up, and I moved him out from behind the counter."

[Carmichael v. The State.]

This was competent evidence, whether of the res gestæ of the killing or not. Defendant sought to show self-defense; that, when he approached deceased for an explanation of why the latter had struck the former's son David, deceased made an effort to shoot him. To rebut the inference that Deshazo had assumed the offensive by advancing from behind the counter to the place where he lay upon the floor and where some of the witnesses saw him, it was competent to show that he was moved to that place after he had become helpless and the res gestæ of his removal. As for the expression of the deceased, that was also competent to show his condition at the time.

(11) There was no reversible error in sustaining an objection to defendant's question to the witness Bayol, "Did you see him (Deshazo) turn it (his pistol) towards Carmichael at all?" This, for the reason that immediately afterwards the witness on defendant's examination went into full particulars of what he saw, telling just how deceased had his pistol and what use he attempted to make of it.

(12) Nor was there error in allowing the state to ask the defendant on cross-examination whether he knew that his son had been down to the council chamber at the fire department as late as 9:30. The killing occurred about 10 o'clock. Defendant had previously testified that he did not know where his son had been before he came to the restaurant. As has already appeared, the son came to the restaurant a few minutes before the killing. The question was permissible on cross-examination. Moreover, in view of defendant's answer, it is not easy to see how the question could have prejudiced his case. He answered that he did not know. So of the other question to defendant to which exception was reserved.

(13) The remark made by the presiding judge in which he signified his concurrence in the assertion of counsel for the state that counsel for the defendant had asked a certain question six times over, and his remark, after an exception was reserved to the foregoing, that there was a record of it, to which also an exception was reserved, may have indicated some impatience; but it cannot be said that they showed a hostile attitude towards defendant or his counsel, nor that they were calculated to prejudice the defense by disparaging counsel in the eyes of the jury, nor did they amount to a comment on the effect of the evidence as the Court of Appeals appears to have considered some remarks of the trial judge shown in the report of *Rigell v. State,* 8 Ala.

App. 46, 62 South. 977, nor can we conceive that they had any possible effect upon the verdict of an intelligent and fair-minded jury. This passage of words between court and counsel was a mere incidental trifle which does not at all appeal to us as a cause for reversal.

(14) Defendant objected to a statement made by special counsel for the state to the effect that the witness Saliba had testified that "he (deceased) called to him for help and said that he (defendant) shot him for nothing." Defendant moved to exclude this remark from the jury, and this motion was overruled. It will suffice to say of this point that Saliba did testify that deceased had called to him for help, and if the rest of counsel's observation was deemed improper as untrue in substance and without support in the evidence, notwithstanding the evidence upon the whole afforded ample ground for the conclusion that defendant shot deceased for nothing of legal consequence, the objection and the motion should have been limited to that objectionable part.

(15) In its oral charge to the jury the court said: "If the defendant was prompted by malice in taking the life of deceased, he would be guilty of murder in the first or second degree, if his act was unlawful."

Defendant excepted. If this excerpt from the charge were all that was said on that feature of the case, it would be capable of a misleading construction. But even then, and without the aid of any context—and it is presented here in that naked condition—taken literally, it states no incorrect proposition of law. It does not say, as counsel seem to argue, that malice alone is sufficient to raise an unlawful homicide to murder in the first degree. The purpose of the statement shown by the excerpt from the charge, we have no doubt, was to inform the jury that malice was a common ingredient of murder in both degree, and it cannot be supposed that the trial court allowed its instruction as well as to the law of the case to rest with this one statement. It is to be regretted that the entire charge, or at least so much of it as bore upon the distinction between the two degrees of murder, has not been sent to this court. However, on consideration of the literal correctness of the excerpt we have before us, and without indulging any presumptions in regard to the rest of the charge to aid the part before us, we are clear that no reversible error has been made to appear.

[Smith v. The State.]

(16) The indictment charged murder in the first degree. Under it and under tendencies of the evidence offered by defendant, it was possible that the jury might convict of a lesser degree of unlawful homicide. Charge 1 was therefore correctly refused.— *Stoball v. State,* 116 Ala. 454, 23 South. 162; *McCoy v. State,* 170 Ala. 10, 54 South. 428.

(17) Charges 2 and 3 were also properly refused. It was said in *Brown v. State,* 109 Ala. 70, 89 20 South. 103, 110, that "more than presumed or implied malice is essential to constitute murder in the first degree." That is a familiar proposition. It is, indeed, the proposition of the statute defining murder in the first degree. But it is not the proposition of these charges or of the brief for appellant, which is that malice, implied or presumed, as, for example, from the unexplained use of a deadly weapon, is not the equivalent of that malice which the statute makes an essential ingredient of murder in the first degree. Indeed, the case cited by appellant affirms, in common with many others, that a conviction of murder in the first degree may rest upon implied malice, where willfulness, deliberation, and premeditation are also shown.

We have thus treated seriatim all those exceptions which zealous and able counsel have thought worthy of argument. Other exceptions were reserved, and they have been considered without finding anything calling for special comment. We find no error, and the judgment and sentence must be affirmed.

Affirmed.

ANDERSON, C. J., and MCCLELLAN and GARDNER, JJ., concur.